## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **RALPH NADER, et al.,** | : |
|  | : |
| **Plaintiffs** | : |
|  | : |
| **v.** | :     **Civil Action No. 07-2136-RMU** |
|  | : |
| **DEMOCRATIC NATIONAL COMMITTEE, et al.** | : |
|  | : |
| **Defendants.** | : |
|  | : |

## PLAINTIFFS' RESPONSE IN OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS

## INTRODUCTION

Defendants Democratic National Committee (DNC) (together with Defendants Mark Brewer and Jack Corrigan), the Kerry-Edwards Campaign (together with Defendant John Kerry), The Ballot Project (together with Defendants Toby Moffett, Elizabeth Holtzman and Robert Brandon), Reed Smith, LLP, Service Employees International Union (SEIU) and America Coming Together (ACT) have each filed separate motions to dismiss Plaintiffs' Amended Complaint. For the sake of efficiency and as a convenience to the Court, Plaintiffs address all of Defendants' arguments in this one Response in Opposition. Specifically, Plaintiffs' Response in Opposition addresses the following questions raised by Defendants: 1) whether Plaintiffs state a claim for civil conspiracy; 2) whether Plaintiffs state claims for abuse of process and malicious prosecution; 3) whether the statute of limitations bars Plaintiffs' claims; 4) whether the

*Noerr-Pennington* doctrine bars Plaintiffs' claims; 5) whether the *Rooker-Feldman* doctrine bars Plaintiffs' claims; 6) whether Plaintiffs have standing to bring their claims; and 7) whether Plaintiffs' request for injunctive relief is moot. To the extent that each Defendant raises unique facts, issues or defenses, Plaintiffs address them individually, within the appropriate section.

## FACTUAL BACKGROUND

Plaintiffs' Amended Complaint alleges that Defendants unlawfully conspired to prevent Ralph Nader and Peter Miguel Camejo (hereinafter, "Nader-Camejo") from running for President and Vice President of the United States, respectively, during the 2004 General Election, in an effort to help Democratic candidates John Kerry and John Edwards win that election by denying voters an alternative choice at the polls. In furtherance of this conspiracy, Defendants jointly planned and executed a nationwide assault of unfounded and abusive litigation against the Nader-Camejo Campaign, pursuant to which conspirators filed twenty-four complaints in eighteen state courts and five complaints before the Federal Election Commission (FEC), all within a twelve-week period between June and September of 2004. The purpose of these complaints was not to vindicate valid legal claims, but rather to use the sheer burden of repetitive and abusive litigation as a means to drain and distract the Nader-Camejo Campaign in the months immediately preceding the election, and to restrain Nader-Camejo from running for public office, *in spite of their qualification* for such office, and *with reckless disregard for their rights* under state and federal law.

The DNC directed Defendants' conspiracy in conjunction with the Kerry-Edwards Campaign and The Ballot Project, a Section 527 organization that Defendants

incorporated specifically for the purpose of coordinating and financing their litigation against Nader-Camejo. Am. Comp. ¶ 5. At least ninety-five lawyers from fifty-three law firms eventually joined Defendants' litigation nationwide. The DNC, its state Democratic Party affiliates and The Ballot Project collectively paid these firms nearly $1 million, while the firms contributed in excess of $2 million more in *pro bono* legal services. *Id.* at ¶ 61. Much of this activity violated federal election law.[1]

Defendants conceived their abusive litigation strategy with wrongful intent, before they could possibly have any basis to form probable cause for their claims. In February 2004, before Mr. Nader had even announced his candidacy, then-Chairman of DNC Terry McAuliffe declared, "We can't afford to have Ralph Nader in the race." *Id.* at ¶ 2. Thus, when Mr. Nader announced his candidacy soon thereafter, Defendants resolved to sue him as many times in as many states as possible. *Id.* at ¶¶ 45-47. "We wanted to neutralize his campaign by forcing him to spend money and resources defending these things," The Ballot Project president Toby Moffett explained during the election, "but much to our astonishment we've actually been more successful than we thought we'd be in stopping him from getting on at all." *Id.* at ¶ 62. After the election, Defendant Moffett reaffirmed Defendants' unlawful intent. "We had a role in the ballot challenges," Mr. Moffett said. "We distracted him and drained him of resources. I'd be less than honest if I said it was all about the law. It was about stopping Bush from getting elected." *Id.* at ¶ 62.

---

[1] The Federal Election Campaign Act prohibits donations to federal election campaigns from corporations, including "in kind" donations of legal services from incorporated law firms. *See* 2 U.S.C. 441b; FEC Advisory Opinion 2006-22. Plaintiffs are preparing a complaint that sets forth the violations of federal election law arising from Defendants' unlawful conspiracy, and will file a copy with the Court once the complaint is duly filed with the FEC.

In states where litigation alone would be insufficient to accomplish their goals, Defendants orchestrated campaigns of harassment, intimidation and sabotage, with the specific intention of preventing Nader-Camejo from complying with state election laws, and to manufacture grounds for Defendants' subsequent litigation. These unlawful tactics proved to be decisive to Defendants' success. Defendants ultimately prevailed in court in only four states – Illinois, Ohio, Oregon and Pennsylvania – and in three of these states, unlawful acts of harassment, intimidation or sabotage directly obstructed or significantly impeded Nader-Camejo's efforts to gain ballot access. *Id.* at ¶¶ 67-71.

Although the great majority of Defendants' lawsuits failed, their conspiracy nevertheless succeeded, by draining the Nader-Camejo Campaign of resources, denying Nader-Camejo ballot access in several states, and denying Plaintiff-voters the choice of voting for them. Defendants' conspiracy did not end there, however. To this day, Defendants' abusive litigation against Mr. Nader remains ongoing, in the form of attachment proceedings initiated in the District of Columbia Superior Court to seize $61,638.45 from his personal accounts. *Id.* at ¶¶ 202-03. Defendant Reed Smith, which nominally represented eight voters who sued to remove Nader-Camejo from Pennsylvania's ballot, now seeks to enforce a judgment that appears to be unprecedented in the history of American jurisprudence, ordering Nader-Camejo to pay $81,102.19 in litigation costs.[2] Indeed, the judgment functions much like a poll tax, effectively penalizing Nader-Camejo for attempting to run for office, just as poll taxes once penalized voters for attempting to vote. *See Harper v. Virginia Bd. of Elections*, 383 U.S. 663 (1966) (striking down poll tax of $1.50). Moreover, as discussed *infra*, the judgment

---

[2] *See In re Nomination Paper of Ralph Nader*, 905 A.2d 450 (Pa. 2006).

was procured by means of a fraud upon the court, and cannot be enforced consistent with basic principles of due process.[3]

Reed Smith purports to be acting on behalf of its nominal clients, but Defendant DNC retained the firm during the 2004 General Election, and Defendant John Kerry and his wife Teresa Heinz Kerry are important clients. Am. Comp. ¶ 204. It simply is not plausible, therefore, that Reed Smith undertook litigation against Nader-Camejo on behalf of eight Pennsylvania voters, and pursued it to such unprecedented extremes, without the knowledge and consent of its co-Defendant clients *who were engaged in similar litigation against Nader-Camejo in other states*. *Id.* at ¶¶ 56-59. Rather, Reed Smith's effort to seize $61,638.45 from Mr. Nader's personal accounts is just what it appears to be: an ongoing act in furtherance of Defendants' conspiracy to abuse judicial processes for the improper purpose of causing Nader-Camejo financial injury and other damages.

The allegations in Plaintiffs' Amended Complaint overwhelmingly support their claim that Defendants engaged in such a conspiracy. A brief but by no means exhaustive summary of these allegations includes the following:

- Defendants formed their unlawful agreement to bring abusive litigation against Mr. Nader before he had even announced his candidacy, and before they could possibly have any basis to form probable cause for such litigation, *id. at* ¶ 45;

- Defendants caused twenty-four complaints to be filed in less than twelve weeks to challenge Nader-Camejo's nomination papers in eighteen states, but did not challenge other candidates' nomination papers, because they believed that Nader-Camejo presented a unique threat to their preferred candidates, *id.* at ¶¶ 1-3;

---

[3] On November 7, 2007, Mr. Nader filed a motion for relief from the judgment in the Superior Court, setting forth the extraordinary facts that gave rise to the unprecedented judgment. The motion, which remains pending, is attached hereto.

- Defendant DNC's former Chairman Terry McAuliffe declared, "We can't afford to have Ralph Nader in the race," and made public and private requests that Mr. Nader either drop out or campaign only in so-called "safe" states *id.* at ¶ 2-3;

- Defendant DNC solicited, financed and coordinated Defendants' litigation against Nader-Camejo, even though DNC officials had no reason to believe such litigation was proper or warranted, *id.* at ¶¶ 1, 61, 118;

- Defendants recruited at least ninety-five lawyers from fifty-three law firms to join their litigation against Nader-Camejo, and dedicated at least $3 million in financial and other resources to the effort, a massive mobilization of resources that was clearly excessive merely to ensure Nader-Camejo's compliance with state election laws, *id.* at ¶ 61;

- Defendants incorporated a Section 527 organization called The Ballot Project, Inc., for the sole purpose of coordinating and financing litigation against Nader-Camejo, and no other candidates, *id.* at ¶ 5;

- Defendant Toby Moffett, who was president of The Ballot Project, made numerous statements confirming that Defendants initiated their litigation against Nader-Camejo with wrongful intent and for an improper purpose:

  - "This guy is still a huge threat. We're just not going to make the same mistake we made in 2000," *id.* at ¶¶ 51;

  - "We're not going to let him do it again," *id.* at ¶¶ 48;

  - "We're doing everything we can to facilitate lawyers in over 20 states," *id.* at ¶ 60;

  - "We wanted to neutralize his campaign by forcing him to spend money and resources defending these things, but much to our astonishment we've actually been more successful than we thought we'd be in stopping him from getting on at all," *id.* at ¶ 62;

  - "We had a role in the ballot challenges. We distracted him and drained him of resources. I'd be less than honest if I said it was all about the law. It was about stopping Bush from getting elected," *id.* at ¶ 63;

- Defendant The Ballot Project retained lawyers or law firms that sued Nader-Camejo in Illinois and Florida (and reimbursed expenses for lawyers or law firms that sued Nader-Camejo in Colorado and Pennsylvania), paying them nearly $180,000, *id.* at ¶¶ 86, 99, 205;

6

- Defendant DNC retained law firms that sued Nader-Camejo in Maine, Mississippi, Ohio and Pennsylvania (and reimbursed expenses for lawyers who participated in Defendants' Florida litigation), paying them nearly $500,000, even though DNC officials explicitly denied that the DNC had done so, *id.* at ¶¶ 57, 61, 64, 120, 130, 165, 205;

- Defendant DNC official and Maine Democratic Party Chair Dorothy Melanson testified under oath that DNC officials directed her to sue Nader-Camejo in Maine, hired her law firm, and expected her to report directly to them regarding the lawsuit's outcome, even though DNC officials explicitly denied that the DNC had done so, *id.* at ¶ 118;

- Defendant DNC officials affiliated with state Democratic Parties initiated litigation against Nader-Camejo in six states, and were connected to litigation in four more, *id. at* ¶ 56;

- Defendant Kerry-Edwards 2004, Inc. directly participated in Defendants' litigation against Nader-Camejo, and Kerry-Edwards Campaign staff drafted at least one complaint that conspirators filed against Nader-Camejo, even though Defendant John Kerry expressly disavowed that his campaign would participate in Defendants' litigation, *id.* at ¶¶ 59, 65, 138, 140;

- Defendants and their co-conspirators made numerous statements confirming that their intention was *not* merely to ensure that Nader-Camejo complied with state election laws, but rather to ensure that Nader-Camejo failed to gain ballot access in their states:

    - "If we think it gets to a point where we need to step in and mobilize to make sure he doesn't get on the ballot, then we will," (spokeswoman for Defendant America Coming Together), *id.* at ¶ 166;

    - "We are being completely open about our intentions. Our goal is to help elect John Kerry the next president of the United States," (Pennsylvania House Minority Leader H. William DeWeese), *id.* at ¶ 182.

Plaintiffs further allege that email records from Defendant DNC, email records from Defendant Kerry-Edwards 2004, Inc., official records of court proceedings and official records on file with the FEC and the IRS confirm Plaintiffs' allegations. In face of such comprehensive, specific and well-documented allegations, Defendants nevertheless insist that their conduct was not unlawful. Defendants did not *intend* to

abuse judicial processes for the improper purpose of inflicting damages upon Nader-Camejo and preventing the candidates from running for public office, they claim, but rather, Defendants merely intended to ensure that their competitors complied with state election laws. Insofar as Defendants urge the Court to accept this alternative "natural explanation" for their unlawful conduct, however, they simply deny allegations that must be taken as true at this stage of the proceedings. *See Zinermon v. Burch*, 494 U.S. 113, 118 (1990). Significantly, Defendants do not deny that their conspiracy *as alleged by Plaintiffs* was unlawful, but only that they did not *in fact* engage in such conspiracy. Defendants' principal "argument" is therefore insufficient as a matter of law to sustain their motions to dismiss.

The weakness of Defendants' position is particularly evident from their undue reliance on a case that simply is not relevant to the case at bar. In a transparent effort to divert the Court from the merits of *this case*, Defendants hope to persuade the Court that Plaintiffs' claims have already been litigated, albeit by *other parties*, in a case previously filed against some of these same defendants. *See Fulani v. McAuliffe*, 2005 U.S. Dist. LEXIS 20400 (S.D.N.Y. 2005). Defendants themselves do not suggest that *Fulani* has any *res judicata* effect on the case at bar, however, and their reliance on that case is neither warranted nor relevant.[4] *Fulani* nevertheless demonstrates, by way of comparison, the strength of Plaintiffs' allegations and the merit of their claims, for the entirety of the conspiracy allegation in that case consisted of one sentence asserted "on information and belief." *See id.* The allegations set forth in Plaintiffs' Amended Complaint, by contrast, set forth Defendants' unlawful conspiracy with detailed specificity. Am. Comp. ¶¶ 45-66.

---

[4] If anything, that other parties accused Defendants of similar misconduct suggests that Defendants may in fact have engaged in such misconduct.

Finally, the supposedly "natural explanation" that Defendants proffer for their conduct is so *fantastic* and *incredible* that it simply cannot be true. Defendants dedicated millions of dollars in resources, incorporated a Section 527 organization, and recruited a veritable army of lawyers, all for the purpose, they now claim, merely to ensure that Ralph Nader and Peter Miguel Camejo complied with state election laws. This supposedly "natural explanation" is not only absurd on its face, but it also contradicts the numerous statements Defendants made, in which they confirmed that their intent was to bankrupt Nader-Camejo and prevent them from running for office, whether or not the candidates complied with state election laws. Moreover, if Defendants believed that they were engaged in legitimate petitioning activity when they initiated their barrage of complaints against Nader-Camejo, why did they deny and fraudulently conceal their conduct? The answer is obvious: Defendants themselves recognize that such conduct was illicit and that their conspiracy was unlawful.

## ARGUMENT

### I.    Plaintiffs' Comprehensive and Detailed Allegations Exceed the Liberal Pleading Standard Set Forth Under Fed. R. Civ. P. 8.

In order to state a claim under the liberal pleading standard set forth in Federal Rule of Civil Procedure 8(a)(2), Plaintiffs must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007), quoting *Conley* v. *Gibson*, 355 U. S. 41, 47 (1957). A complaint need not set forth "detailed factual allegations," but rather, the allegations must be sufficient merely "to raise a right to relief above the speculative level." *Id.*, citing 5 C. Wright & A. Miller, Federal Practice and Procedure §1216, pp.

235-36 (3d ed. 2004). Where a conspiracy is pled, the allegations must suggest only that discovery will reveal evidence sufficient to infer an illegal agreement, but not that the existence of such agreement is probable. *Twombly*, 127 S. Ct. at 1964-65. Once a claim has been stated, therefore, "it may be supported by showing *any set of facts* consistent with the allegations in the complaint." *Id.* at 1969 (emphasis added).

The stringent standard for evaluating a motion to dismiss a complaint under Rule 12(b) is well settled. The factual allegations set forth in the complaint must be taken as true. *See Zinermon*, 494 U.S. at 118. Furthermore, all reasonable inferences must be drawn in favor of the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). Accordingly, provided that a complaint is well-pleaded, a motion to dismiss must be denied, even if it appears "that a recovery is very remote and unlikely." *Twombly*, 127 S. Ct. at 1965, quoting *Scheuer*, 416 U.S. at 236.

Plaintiffs' Amended Complaint well exceeds the liberal pleading standard set forth under the Federal Rules of Civil Procedure. Far beyond the minimal requirements of Rule 8, Plaintiffs set forth in comprehensive and specific detail the tortious conduct of Defendants and the resulting injury to Plaintiffs. Because Plaintiffs' allegations must be taken as true, the only question before the Court on Defendants' motions to dismiss is whether Plaintiffs would be entitled to relief if they proved these allegations at trial. This question must be answered in the affirmative.

Accordingly, Defendants' motions to dismiss fail as a matter of law.

## II.    Plaintiffs State a Claim for Civil Conspiracy.

Defendants argue that Plaintiffs fail to state a claim for civil conspiracy on two grounds. First, Defendants argue that Plaintiffs fail to allege a conspiracy with sufficient

particularity. Second, Defendants argue that Plaintiffs fail to allege underlying wrongful conduct sufficient to support a claim for civil conspiracy. Neither of these arguments has any merit.  To state a claim for civil conspiracy, Plaintiffs must allege: 1) an agreement between two or more persons; 2) to accomplish an unlawful purpose or a lawful purpose by unlawful means; and 3) resultant damages to plaintiff. *See Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. App. 2000). Plaintiffs' allegations are clearly sufficient to establish each of these elements.

Plaintiffs allege that the DNC, the Kerry-Edwards Campaign and a Section 527 organization called The Ballot Project orchestrated a nationwide conspiracy to bankrupt the 2004 presidential campaign of Ralph Nader and Peter Miguel Camejo, in an effort to deny voters the choice of voting for them in the 2004 general election. Am. Comp. ¶¶ 45-66. Plaintiffs allege that Defendants and their co-conspirators reached this agreement "after the Democrats' defeat in the 2000 election," which they blamed upon Mr. Nader, and that they agreed to try to prevent him from running again if he announced his candidacy in 2004. *Id.* at ¶ 45. Having reached this agreement, approximately three dozen leaders of the conspiracy "met privately to discuss their plans on July 26, 2004 at the Four Seasons Hotel in Boston." *Id.* at ¶ 46. The Ballot Project's co-directors, Defendants Toby Moffett and Elizabeth Holtzman, attended along with Defendant Robert Brandon, whose offices housed The Ballot Project. *Id*. Defendant DNC paid for the meeting. *Id.*

At the Four Seasons meeting, the conspirators discussed their plan to sue and otherwise obstruct Nader-Camejo in as many states as possible, in an effort "to drain [Mr. Nader] of resources and force him to spend his time and money." *Id.* at ¶ 47 (quoting Defendant Toby Moffett). The Ballot Project was incorporated "specifically for the

11

purpose of coordinating and financing" this nationwide conspiracy. *Id.* at ¶ 5. Plaintiffs

further allege that the aforementioned conspirators later attended the Democratic National

Convention, where they distributed a detailed action memo outlining their plan, solicited

donations and recruited others into their conspiracy. *Id.* at ¶¶ 49-52. Finally, plaintiffs

allege that, in furtherance of the conspiracy, the conspirators filed twenty-four state court

complaints and five FEC complaints against the Nader-Camejo Campaign within twelve

weeks between June and September 2004, and engaged in numerous acts of harassment,

intimidation and sabotage, all of which had the purpose and effect of causing Plaintiffs

financial injury and other damages and violating their constitutional rights. *Id.* at ¶¶ 67-

232.

Defendants correctly note that a plaintiff cannot merely set forth a formulaic

recitation of the elements of a cause of action for conspiracy, but rather must allege

enough factual matter to suggest that an agreement was made. Defendants also correctly

note that, in order for the conspiracy to be actionable, a plaintiff must allege an

underlying unlawful purpose. *See Weishapl v. Sowers*, 771 A.2d 1014, 1023-1024 (D.C.

2001); *Executive Sandwich Shop*, 749 A.2d 724; *Griva v. Davison*, 637 A.2d 830, 848

(D.C. 1994). Defendants are plainly wrong, however, to suggest that Plaintiffs fail to

allege facts sufficient to satisfy their burden. *See id.*

To state a claim for civil conspiracy, Plaintiffs need not allege an express

agreement among all co-conspirators, because courts generally infer such agreement from

indirect evidence. *See Hobson v. Wilson*, 737 F.2d 1, 54 (D.C. Cir. 1984); *Halberstam v.

Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983). Likewise, Plaintiffs need not allege that each

Defendant planned, participated, or even knew about each wrongful act for which they

are to be held liable, but only that Defendants shared "a single plan, the essential nature and general scope of which were known" to them. *Hobson*, 737 F.2d at 51-52; *see Halberstam*, 705 F.2d at 481, 486. This is because, while "the conspiracy is not independently actionable…it is a means for establishing vicarious liability for the underlying tort." *Halberstam*, 705 F.2d at 479. Plaintiffs therefore satisfy their burden by alleging that Defendants: 1) agreed; 2) to cause financial injury and other damages to Plaintiffs and to violate their constitutional rights by means of groundless and abusive litigation; and 3) that Defendants did in fact cause such harm. Am. Comp. ¶¶ 45-66. Accordingly, Plaintiffs state a claim for civil conspiracy.

Defendants place great emphasis on the common-sense statement in Plaintiffs' Amended Complaint that the allegations set forth therein "do not *necessarily* apply to every Defendant and every conspirator" named in the complaint. Am. Comp. at ¶ 14. Misreading the plain language of this statement, Defendants claim that Plaintiffs' allegations *necessarily do not* apply to each named Defendant. Notwithstanding their effort to twist the clear meaning of the words, however, Defendants cannot change the legal standard applicable to civil conspiracies, which holds that all conspirators may be held vicariously liable for all acts in furtherance of the conspiracy. *See generally Halberstam*, 705 F.2d 472. Regardless, Plaintiffs' allegations clearly suggest that discovery will reveal evidence from which an illegal agreement could be inferred with respect to each named Defendant, and that is all that Plaintiffs must do to state a claim for conspiracy. *Twombly*, 127 S. Ct. at 1964-65.

### A. Plaintiffs Allege Facts Sufficient to State a Claim Against the DNC, Mark Brewer and Jack Corrigan.

13

Plaintiffs allege that Defendant DNC directed, coordinated and financed Defendants' unlawful conspiracy. Specifically, DNC officials directed state party officials to initiate litigation against Nader-Camejo, and the DNC hired and paid for several state parties' lawyers. In addition, high-level DNC staff, including Jack Corrigan, developed and coordinated the conspiracy's nationwide litigation strategy, while rank-and-file DNC staff helped prepare the conspirators' complaints. On information and belief, the DNC also coordinated with The Ballot Project to secure *pro bono* counsel in other states. Am. Comp. ¶¶ 56-58.

Facts alleged to support these allegations include email records indicating that Jack Corrigan and other DNC staff helped prepare Defendants' complaints, as well as FEC records indicating that the DNC retained several law firms that sued Nader-Camejo in several states, including Maine, Mississippi, Ohio and Pennsylvania. In addition, at least six DNC officials affiliated with state Democratic Parties, including Mark Brewer, filed suit against Nader-Camejo in their own names, while at least four more DNC officials directly participated or were connected to Defendants' litigation. *Id.*

Accordingly, because Plaintiffs allege facts sufficient to suggest that discovery will reveal evidence from which an illegal agreement could be inferred with respect to Defendant DNC, Plaintiffs allege facts sufficient to state a claim for civil conspiracy against the DNC. *See Twombly*, 127 S. Ct. at 1964-65.

### B. Plaintiffs Allege Facts Sufficient to State a Claim Against The Ballot Project, Elizabeth Holtzman, Toby Moffett and Robert Brandon.

Plaintiffs allege that The Ballot Project directed Defendants' conspiracy in conjunction with the DNC and the Kerry-Edwards Campaign, and that the Section 527 organization was incorporated specifically for the purpose of coordinating and financing

Defendants' litigation against the Nader-Camejo Campaign. Specifically, Plaintiffs allege that The Ballot Project retained Defendants' lawyers or law firms in Florida and Illinois, and that the organization reimbursed costs incurred by Defendants' law firms in Colorado and Pennsylvania. In addition, The Ballot Project recruited lawyers and law firms nationwide to join Defendants' litigation against Nader-Camejo, and successfully solicited more than $2 million in *pro bono* legal services from such firms. Toby Moffett and Elizabeth Holtzman are directors of The Ballot Project, and Robert Brandon housed the organization in his offices.

Facts alleged to support these allegations include IRS records documenting payments The Ballot Project made to Defendants' law firms in the aforementioned states, as well as numerous statements by The Ballot Project's president, Defendant Toby Moffett, confirming the organization's lead role in orchestrating Defendants' unlawful conspiracy. Am. Comp. at ¶¶ 86, 99, 205.

Accordingly, because Plaintiffs allege facts sufficient to suggest that discovery will reveal evidence from which an illegal agreement could be inferred with respect to Defendants The Ballot Project, Toby Moffett, Elizabeth Holtzman and Robert Brandon, Plaintiffs allege facts sufficient to state a claim for civil conspiracy against these parties. *See Twombly*, 127 S. Ct. at 1964-65.

### C. Plaintiffs Allege Facts Sufficient to State a Claim Against Kerry-Edwards 2004, Inc. and John Kerry.

Plaintiffs allege that Defendants Kerry-Edwards 2004, Inc. and John Kerry were the primary intended beneficiaries of Defendants' unlawful conspiracy, that John Kerry had personal knowledge of Defendants' conduct on his behalf, and that high level staff from the Kerry-Edwards Campaign directly participated in such conduct, despite Mr.

Kerry's prior claim that they would not. Defendants' unlawful conspiracy was specifically intended to help the Kerry-Edwards Campaign win the 2004 presidential election by using unfounded and abusive litigation to bankrupt their competitors and deny voters an alternative choice at the polls. Judy Reardon, the Kerry-Edwards Campaign's deputy national director for northern New England, drafted at least one of Defendants' complaints, and coordinated with the state Democratic Party officials and attorneys who filed it.

Facts alleged to support these allegations include email records from the Kerry-Edwards Campaign, FEC records confirming Ms. Reardon's employment by the Kerry-Edwards Campaign, Defendant John Kerry's public statements regarding Defendants' conduct, and numerous public statements by Defendants confirming their purpose and intention to benefit the Kerry-Edwards Campaign by means of their conspiracy. Am. Comp. at ¶¶ 58-59, 65.

Accordingly, because Plaintiffs allege facts sufficient to suggest that discovery will reveal evidence from which an illegal agreement could be inferred with respect to Defendants Kerry-Edwards 2004, Inc. and John Kerry, Plaintiffs allege facts sufficient to state a claim for civil conspiracy against these parties. *See Twombly*, 127 S. Ct. at 1964-65.

### D.  Plaintiffs Allege Facts Sufficient to State a Claim Against Reed Smith.

Plaintiffs allege that Defendant Reed Smith directly participated in Defendants' conspiracy by initiating proceedings to challenge Nader-Camejo's nomination papers in Pennsylvania, and by initiating attachment proceedings to seize $61,638.45 from Mr. Nader's personal accounts in satisfaction of a judgment that was procured by means of a

fraud upon the court.[5] Facts alleged to support these allegations include FEC records indicating that the DNC retained Reed Smith during the 2004 General Election, IRS records indicating that The Ballot Project reimbursed Reed Smith's co-counsel, and media reports and other public documents indicating that Reed Smith represents or has represented John Kerry and his wife, Teresa Heinz Kerry, in numerous matters. Am. Comp. at ¶¶ 70, 179-205. Accordingly, because Plaintiffs allege facts sufficient to suggest that discovery will reveal evidence from which an illegal agreement could be inferred with respect to Defendant Reed Smith, Plaintiffs allege facts sufficient to state a claim for civil conspiracy against Reed Smith. *See Twombly*, 127 S. Ct. at 1964-65.

### E.  Plaintiffs Allege Facts Sufficient to State a Claim Against SEIU.

Plaintiffs allege that Defendant SEIU directly participated in Defendants' conspiracy by orchestrating, in conjunction with Defendant ACT, a coordinated campaign to sabotage Nader-Camejo's Oregon nomination papers, and by engaging in other unlawful acts to deny Nader-Camejo ballot access in Oregon, including hiring a law firm and private detectives that made false threats to Nader-Camejo Campaign petitioners. Am. Comp. at ¶¶ 166-178. In addition, although SEIU objects that "the amended complaint does not allege that SEIU was responsible for or had any role in any civil action brought against the Nader-Camejo campaign," SEIU Mot. at 11, SEIU moved to intervene as a party to proceedings to deny Nader-Camejo ballot access in Oregon. *See Kucera v. Bradbury*, 97 P3d 1191 (2004).[6] That motion was denied, but SEIU was permitted to appear as *amicus curiae*. Accordingly, because Plaintiffs allege facts sufficient to suggest that discovery will reveal evidence from which an illegal agreement

---

[5] *See* note 3, *supra*.

could be inferred with respect to Defendant SEIU, Plaintiffs allege facts sufficient to state a claim for civil conspiracy against SEIU.[7] *See Twombly*, 127 S. Ct. at 1964-65.

### F. Plaintiffs Allege Facts Sufficient to State a Claim Against ACT.

Plaintiffs allege that Defendant ACT directly participated in Defendants' conspiracy by orchestrating, in conjunction with Defendant SEIU, a coordinated campaign to sabotage Nader-Camejo's Oregon nomination papers, and by engaging in other unlawful acts to deny Nader-Camejo ballot access in Oregon. Facts alleged to support these allegations include a written statement by a former ACT employee, who provided a detailed description of the specific manner in which "the higher echelons" ACT and SEIU management jointly planned to sabotage Nader-Camejo's nomination papers. Am. Comp. ¶ 171. In addition, an ACT spokesperson publicly stated that the organization would "mobilize to make sure [Nader-Camejo] doesn't get on the ballot." *Id.* at ¶ 69. Accordingly, because Plaintiffs allege facts sufficient to suggest that discovery will reveal evidence from which an illegal agreement could be inferred with respect to Defendant ACT, Plaintiffs allege facts sufficient to state a claim for civil conspiracy against ACT. *See Twombly*, 127 S. Ct. at 1964-65.

### III.    Plaintiffs State Claims for Abuse of Process and Malicious Prosecution.

---

[6] The Court may take judicial notice of such proceedings. *See Hinton v. Shaw Pittman Potts & Trowbridge*, 257 F. Supp. 2d 96, 100 n.5 (D.D.C. 2003)

[7] SEIU takes exception to Plaintiffs' allegation that the union donated $1 million to the DNC in 2004. *See* SEIU Mot. at 19, n.13. Although SEIU notes that such donation would be in violation of federal election law, which prohibits donations to national political parties, 2 U.S.C. § 441b(a), it is unclear whether SEIU actually denies the allegation. Nevertheless, a press release SEIU issued on November 1, 2004, with the headline "Anatomy of an Election Strategy: The Facts on SEIU's Role in Bringing Home a Victory for America's Working Families," states that "SEIU gave $1 million to the DNC." Lest this claim be mistaken for a typographical error, a document attached to the press release, entitled "SEIU's Involvement in 2004 Progressive Political Organizations," reaffirms that "SEIU contributed $1,000,000 to fund various DNC activities." Both documents are available on SEIU's website. *See* SEIU Media Center, *available at* http://seiu.org/media/pressreleases.cfm?pr_id=1201, last visited March 30, 2008. The Court may take judicial notice of newspaper articles and other public information. *See Heliotrope General, Inc. v. Ford Motor Co.*, 189 F. 3d 971, 981 (9th Cir. 1999).

In recognition of the truism that "the right to litigate is not the right to become a nuisance," courts in the District of Columbia have long held that a cause of action will lie for "repeated abuse of [court] processes." *Soffos v. Eaton*, 152 F.2d 682, 683 (D.C. Cir. 1945), *citing Melvin v. Pence*, 130 F.2d 423 (D.C. 1942). In *Soffos*, the "repeated abuse" consisted of four lawsuits that Defendant allegedly initiated against Plaintiff maliciously and without probable cause. Defendant had filed only two lawsuits, but another party had filed two more, allegedly on Defendant's behalf, and Plaintiff therefore sued Defendant, seeking "damages for the expense of defending the suits, injury to [Plaintiff's] reputation," and other damages. *Id.* The Court found that Plaintiff had stated a claim:

> The burden of being compelled to defend successive unconscionable suits is not one which would necessarily result in all suits prosecuted to recover for like causes of action. The burden increases in more than arithmetical proportion. … [S]uccessive suits may even wear a defendant down to the point of capitulation. We see no good reason why the law should tolerate repeated abuse of its processes. To allow redress for such abuse will not seriously hamper the honest assertion of supposed rights. No one is likely to be deterred from litigating an honest claim by fear that some future jury may erroneously decide that he has brought two suits maliciously and without probable cause.

*Id.* In considering whether to recognize a cause of action in *Soffos*, the Court was concerned to strike a balance "between the social interests in preventing unconscionable suits and in permitting honest assertion of supposed rights." The Court held, however, that causing four such "unconscionable suits" to be filed was sufficient grounds to sustain a cause of action. *Id.*

In *Soffos* and other early cases, District of Columbia courts did not distinguish between malicious prosecution and abuse of process. *See*, *e.g.*, *Davis v. Boyle Bros., Inc.*, 73 A.2d 517 (D.C. 1950) (holding one "unconscionable suit" sufficient to sustain a cause of action). Now, however, the distinction is well-established: malicious prosecution refers

to the wrongful *initiation* of process, whereas abuse of process refers to the wrongful use of process *after* it has been properly issued. *See generally* 1 AM. JUR. 2D *Abuse of Process* § 3 (1994). Often, as in the case at bar, the same set of facts gives rise to a cause of action for both torts. *See Williams v. City Stores Co.*, 192 A.2d 534, 537 (D.C. 1963), *citing Hall v. Field Enterprises*, 94 A.2d 479, 481 (D.C. 1959). Thus, where Defendants' "repeated abuse of [court] processes" consists of not four but *twenty-four* complaints they caused to be filed in eighteen state courts, as well as five complaints before the FEC, Plaintiffs' Amended Complaint states claims for both malicious prosecution and abuse of process.

## A. Plaintiffs State a Claim for Abuse of Process.

Abuse of process is defined as a "perversion of court processes to accomplish some end which the process was not intended by law to accomplish, or which compels the party against whom it has been used to do some collateral thing which he could not legally and regularly be compelled to do."[8] *Field Enterprises, Inc.*, 94 A.2d at 481; *see Morowitz v. Marvel*, 423 A.2d 196 (D.C. 1980); *Chatterton v. Janousek*, 280 F.2d 719 (D.C. 1960); *Hall v. Hollywood Credit Clothing Company*, 147 A.2d 866 (D.C. 1959). "The critical concern in abuse of process cases is whether process was used to accomplish an end unintended by law." *Morowitz*, 423 A.2d at 198; *Bown v. Hamilton*, 601 A.2d 1074, 1079 (D.C. 1992); *see also Heck v. Humphrey*, 512 U.S. 477, 486 n.5

---

[8] Plaintiffs agree with Defendants that no conflict of law issue exists with respect to Plaintiffs' abuse of process claims, and that the Court therefore should apply District of Columbia law. *See, e.g., Nienstedt v. Wetzel*, 651 P.2d 876, 881 (Ariz. App. 1982) (defining abuse of process); *Sundeen v. Kroger*, 133 S.W.3d 393, 398 (Ark. 2003) (same); *Blue v. Weinsteen*, 381 So. 2d 308, 311 (Fl. App. 1980) (same); *Withall v. Capitol Federal Savings of America*, 508 N.E.2d 363, 368 (Il. App. 1987) (same); *Sarvold v. Dodson*, 237 N.W.2d 447, 449 (Iowa 1976) (same); *Moore v. Michigan National Bank*, 117 N.W.2d 105 (Mich. 1962) (same); *Weststar Mortgage Corporation v. Jackson*, 61 P.3d 823 (N.M. 2002) (same); *Yaklevich v. Kemp, Schaeffer & Rowe Company*, 626 N.E.2d 115, 118 (Oh. 1994) (same); *Pfaendler v. Bruce*, 98 P.3d 1146,

(1994); *Scott v. District of Columbia*, 101 F.3d 748, 755 (D.C. Cir. 1997). To state a claim for abuse of process, therefore, a plaintiff must allege 1) that defendant perverted the judicial process to achieve a purpose not contemplated in the regular prosecution of the charge, and 2) that defendant had an ulterior motive. *Hollywood Credit Clothing Company*, 147 A.2d at 868; *Geier v. Jordan*, 107 A.2d 440 (D.C. 1954); *Field Enterprises, Inc.*, 94 A.2d at 480.

Plaintiffs have clearly pled each of these elements. As to the first, Plaintiffs allege that Defendants caused twenty-four complaints to be filed against their political competitors in eighteen states in the months immediately preceding the 2004 General Election, "not to vindicate valid claims, but to use the sheer burden of litigation itself as a means to bankrupt and disrupt" their competitors' campaign. Am. Comp. ¶ 62. In so doing, Defendants perverted the process for challenging candidates' qualifications for public office by using that process as a means *to prevent qualified candidates* from running for public office. As to the second element, Plaintiffs allege that Defendants' ulterior motive was to help their preferred candidates win the 2004 presidential election by bankrupting a competing campaign, and thereby denying voters the choice of voting for their competitors. *Id.* at ¶ 4. Such motive is "ulterior," because Defendants claimed, and still do claim, that their intention was only to ensure that Nader-Camejo complied with state election laws, when in fact, their motive was *to ensure that Nader-Camejo did not comply* with such laws.

No only do Plaintiffs plead the elements necessary to state a claim for abuse of process, but their allegations describe precisely the sort of "repeated abuse of [court]

---

1152 (Or. App. 2004) (same); *Simkins Industries, Inc. v. Fuld & Co.*, 392 F. Supp. 126, 130 (E.D. Pa. 1975) (same); *Brownsell v. Klawitter*, 306 N.W.2d 41, 44 (Wis. 1981) (same).

processes" that District of Columbia courts have long recognized as actionable. *See Soffos*, 152 F.2d at 683. Thus, District of Columbia courts recognize that abuse of process claims may arise "not based on the particular steps [defendant] took…[but] on the overall legitimacy of [defendant's] strategy." *Neumann v. Vidal*, 710 F.2d 856, 861 (D.C. Cir. 1983). In such cases, where "no single incident in a continuous chain of tortious activity can fairly or realistically be identified as the cause of significant harm," courts hold that the "cumulative effect" of such conduct is actionable. *Page v. United States,* 729 F.2d 818, 821-22 (D.C. Cir. 1984). This is precisely what Plaintiffs allege: that Defendants' entire nationwide litigation strategy was illegitimate, because its cumulative effect was intended to bankrupt the Nader-Camejo Campaign and to prevent Nader-Camejo from running for office. *See Neumann*, 710 F. 2d at 861; *Page*, 729 F. 2d at 821-22. This is a paradigmatic case of abuse of process. *See Whelan v. Abell*, 953 F.2d 663, 673 (D.C. Cir. 1992) (holding that "intentionally causing severe financial injury through the prosecution of legal proceedings" is an abuse of process).

In light of the foregoing, Plaintiffs' allegations are clearly sufficient to survive Defendants' motions to dismiss. *Compare*, *e.g.*, *Whelan*, 953 F.2d 663 (reversing dismissal where plaintiff alleged that defendant fabricated charges in complaint filed in order to harm plaintiff's business); *Neumann*, 710 F.2d 856 (reversing dismissal where plaintiff alleged that defendant brought patent dispute in order to scare off plaintiff's investors); *Williams*, 192 A.2d 534 (reversing dismissal where plaintiff alleged defendant used attachment process to collect invalid debt); *Hollywood Credit Clothing Co.*, 147 A.2d 866 (same); *with Bown*, 601 A.2d 1074 (upholding dismissal where plaintiff alleged that defendant landlord brought suit for possession in order to take possession of house);

*Morowitz*, 423 A.2d 196 (upholding dismissal where plaintiff alleged that defendant filed a counterclaim); *Field Enterprises*, 114 A.2d 840 (upholding dismissal where plaintiff alleged that defendant used process to collect an unpaid debt); *Geier*, 107 A.2d 440 (upholding dismissal where plaintiff alleged that defendant used process to recover rent paid in reliance on plaintiff's fraud).

Accordingly, Plaintiffs state a claim for abuse of process.

### B. Plaintiffs State a Claim for Malicious Prosecution.

Plaintiffs also state a claim for malicious prosecution.[9] To state such a claim, a plaintiff must allege four elements: 1) the underlying suit terminated in plaintiff's favor; 2) malice on the part of defendant; 3) lack of probable cause for the underlying suit; and 4) special injury occasioned by plaintiff as the result of the original action. *See Morowitz*, 423 A.2d at 198, *citing Ammerman v. Newman*, 384 A.2d 637 (D.C. 1978). Plaintiffs have clearly pled all four elements.

Plaintiffs allege that Defendants caused twenty-four complaints in eighteen state courts and five FEC complaints to be filed against the Nader-Camejo Campaign, and that the proceedings terminated in Plaintiffs' favor in every state except Arizona, Illinois, Ohio, Oregon and Pennsylvania, and that the FEC took no action with respect to each of Defendants' five complaints. Am. Comp. ¶ 71. Accordingly, Plaintiffs allege facts sufficient to establish the first element of favorable termination.

Plaintiffs further allege that Defendants caused the aforementioned complaints to be filed "in a deliberate attempt to use the sheer burden of litigation itself as a means to

---

[9] A potential conflict of law exists with respect to Plaintiffs' malicious prosecution claims, because the District of Columbia requires "special injury" as an element of the tort, whereas many other jurisdictions only require plaintiffs to plead damages. For purposes of the following discussion only, Plaintiffs assume that District of Columbia law will apply, and accordingly treat "special injury" as an element of the tort.

prevent Mr. Nader from running for public office," and that Defendants' intention was "to deny Plaintiff-voters and others the choice of voting for [Nader-Camejo]." Am. Comp. at ¶¶ 2, 45. Defendants therefore evinced a "willful, wanton, reckless or oppressive disregard to the rights of the plaintiff[s]," which is the very definition of malice. *Ammerman*, 384 A.2d at 641; *Tyler v. Cent. Charge Serv., Inc.*, 444 A.2d 965, 969 (D.C. 1982). Accordingly, Plaintiffs allege facts sufficient to establish the second element of malice. *See Tyler*, 444 A.2d at 969 (the determination of malice is "exclusively for the factfinder").

Whether Defendants had probable cause for initiating legal proceedings against Plaintiffs is a mixed question of law and fact. *See Smith v. Tucker*, 304 A.2d 303, 306 (D.C. 1973) ("The existence of the facts [is] for the jury, but their effect when found is a question for the determination of the court") (citations omitted). The question in the case at bar, however, is not a close one. In a civil action for malicious prosecution, probable cause is defined as the existence of "facts and circumstances as will warrant a cautious man in the belief that his action and the means taken in prosecuting it are legally just and proper." *Id.* at 639-40. Plaintiffs allege that Defendants decided to initiate proceedings against Mr. Nader before he had even announced his candidacy. Am. Comp ¶ 1. Thus, it is not merely *improbable* that Defendants believed their litigation to be "legally just and proper," but actually *impossible* that they could have formed such belief prior to the existence of the nomination papers that they eventually filed suit to challenge. Moreover, once Nader-Camejo filed their nomination papers, the decision to challenge them was, at least in some cases, made by DNC officials who had no basis for believing that such

litigation was legally just and proper. Am. Comp. ¶ 118. Accordingly, Plaintiffs allege

facts sufficient to establish the third element of lack of probable cause.

Finally, Plaintiffs allege the requisite "special injury" on two alternative grounds.

Special injury is injury that "would not necessarily occur in all suits prosecuted for

similar causes of action." *Tri-State Hospital Supply Corp. v. United States*, 2007 U.S.

Dist. Lexis 48609, 15 (D.D.C. 2007), *citing Weisman v. Middleton*, 390 A.2d 996, 1000

(D.C. 1978). In the District of Columbia, however, courts also recognize that "being

forced to defend multiple proceedings may constitute special injury." *Id.*, *citing Weisman*,

390 A.2d at 1000; *Davis*, 73 A.2d at 520; *Soffos*, 152 F.2d at 685. In *Tri-State Hospital*

*Supply Corp.*, the Court rejected Tri-State's argument that the burden of defending itself

in government-initiated penalty assessment and collection proceedings constituted special

injury, because there was "no evidence that any unusual or exceptional procedures were

employed…nor anything to suggest that the proceedings were longer or more onerous"

than the usual case. *Id.* As previously established, however, the case at bar concerns

"repeated abuse of [court] processes," and therefore falls in line with *Soffos* and *Davis*,

wherein the Court found that such repeated abuse satisfied the element of special injury.

*See Soffos*, 152 F.2d at 683 (holding four separate proceedings sufficient to establish

special injury); *Davis*, 73 A.2d at 520 (holding "one suit plus…something more than the

usual suit brought maliciously and without probable cause" sufficient to establish special

injury). Clearly, therefore, the twenty-four complaints Defendants caused to be filed in

eighteen state courts are sufficient to establish special injury. *See id.*

Plaintiffs plead special injury on the alternative ground that Defendants induced

Mr. Camejo to pay $20,000 and initiated attachment proceedings in an effort to seize

$61,638.45 from Mr. Nader's personal accounts, in satisfaction of a judgment which, Plaintiffs allege, was wrongfully procured by means of a fraud upon the court. Am. Comp. ¶¶ 181-207. Such injury not only "would not necessarily occur in all suits prosecuted for similar causes of action," *Tri-State Hospital Supply Corp.*, 2007 U.S. Dist. Lexis 48609, *15, but the injury Defendants inflicted upon Mr. Camejo and Mr. Nader appears to be unprecedented in the entire history of American jurisprudence. Certainly, Defendants have cited no case in which a candidate for public office has been ordered to pay litigation costs of any amount, let alone $81,102.19, to private parties that sue to remove them from a state ballot. Plaintiffs therefore allege facts sufficient to establish the fourth element of such injury on two alternative grounds.

Accordingly, Plaintiffs state a claim for malicious prosecution.

### IV.    Plaintiffs' Claims Are Actionable.

#### A.  Tortious Conduct in Furtherance of Defendants' Conspiracy Occurred Within the Limitations Period and Remains Ongoing.

Defendants concede that the conspirators' FEC actions were not resolved in Plaintiffs' favor until April 21, 2006, well within three years of the date that Plaintiffs filed their complaint, on October 31, 2007. According to Defendants' own position, therefore, Plaintiffs' claims are not time barred.

Additionally, the barrage of litigation that Defendants unleashed upon Plaintiffs, with the specific intention of causing them financial injury and other damages and violating their constitutional rights, continues to the present day in the form of attachment proceedings that Defendant Reed Smith initiated in an effort to seize $61,638.45 from Mr. Nader's personal accounts, in satisfaction of a judgment that is without precedent in the history of American jurisprudence, and which, Plaintiffs allege, was wrongfully

procured by means of a fraud upon the court. Am. Comp. ¶¶ 181-207. Defendants' conspiracy thus constitutes a continuing tort, and Plaintiffs' claims are actionable on the alternative ground that wrongful acts in furtherance of the conspiracy remain ongoing. *See Jung v. Mundy, Holt & Mance, P.C.*, 372 F.3d 429, 433 (D.C. Cir. 2004), citing *Whelan v. Abell*, 953 F.2d 663, 673 (D.C. Cir. 1992).

Courts in the District of Columbia hold that the "prosecution of a lawsuit can constitute a continuing tort." *Jung*, 372 F.3d at 433 (D.C. Cir. 2004), quoting *Whelan*, 953 F.2d at 673. This is because:

> [A] lawsuit is a continuous, not an isolated event, because its effects persist from the initial filing to the final disposition. . . . A defendant subject to a lawsuit is likely to suffer damage not so much from the initial complaint but from the cumulative costs of defense and the reputational harm caused by an unresolved claim.

*Id.* The courts' rationale applies with even greater force in this case, where the tortious "chain of conduct" arises not from just one lawsuit, but from eighteen different lawsuits and five administrative proceedings, all initiated pursuant to a conspiracy to bankrupt the same adversarial party. *See Whelan*, 953 F.2d at 674 ("The commencement of a lawsuit is only the first link in a chain of conduct that does not end until the complaining party ceases prosecution of the suit"). In such cases, District of Columbia courts hold that the tortious conduct is actionable provided that at least one injurious act occurred within the limitation period. *See id.* at 673, citing *DeKine v. District of Columbia,* 422 A.2d 981, 988 n.16 (D.C. 1980) (stating elements of continuing tort); *see also Whelan*, 953 F.2d at 673 (statute of limitations on abuse of process claim begins to run not when abusive claim is asserted, but when it ceases to be asserted) (citation omitted).

27

Defendants here argue that Plaintiffs' claims are "time-barred," at the same time that their co-conspirators continue to assert the very claims that give rise to Plaintiffs' cause of action. Defendants cannot acquire a right to continue their tortious conduct, however, simply by arguing that Plaintiffs' claims arising from such conduct are time barred. *See Whelan*, 953 F.2d at 674; *Jung*, 372 F.3d at 434. Rather, courts applying the law of the District of Columbia in such cases hold that Plaintiffs are entitled to bring their claims so long as the continuing tort remains ongoing. To adopt a contrary rule "would have the perverse result of conferring on the tortfeasor the right to continue the tortious conduct and harm the victim anew." *Jung*, 372 F.3d at 434.

Because Plaintiffs have alleged facts that establish a continuing tort, as well as ongoing acts in furtherance thereof, Defendants' argument that Plaintiffs' claims are time barred is wrong as a matter of law. Am. Comp. ¶ 207 (citing payments from Defendant The Ballot Project, and from Defendant DNC, to co-conspirator law firms who continue to assert, as the true parties in interest, claims against Plaintiff). Moreover, as co-conspirators, Defendants are vicariously liable for injurious acts in furtherance of the conspiracy, *Halberstam*, 705 F.2d at 479, and Defendants may not avoid such liability by pleading the statute of limitations while such acts are ongoing. *See Whelan*, 953 F.2d at 674; *Jung*, 372 F.3d at 434.

## B. Defendants Fraudulently Concealed Their Conduct.

Defendants' argument that Plaintiffs' claims are time barred also fails because Plaintiffs allege fraudulent concealment by the conspirators. Am. Comp. at ¶¶ 66-67; *see generally Richards v. Mileski*, 662 F.2d 65, 70 (D.C. Cir. 1981) ("fraudulent concealment requires that the defendant commit some positive act tending to conceal the cause of

action from the plaintiff, although any word or act tending to suppress the truth is enough"). An act of fraudulent concealment by one conspirator generally tolls the statute of limitations as to all co-conspirators, and also to the underlying substantive claims. *See Riddell v. Riddell Washington Corp.*, 866 F.2d 1480 (D.C. Cir. 1989). A question of fact therefore exists with respect to the date on which Plaintiffs' cause of action accrued. *See Jung*, 372 F.3d at 433 (statute of limitations begins to run "when the plaintiff is or should be aware that he or she is being injured by a continuing tort"), *quoting Beard v. Edmondson & Gallagher*, 790 A.2d 541, 548 (D.C. 2002). Accordingly, Defendants' affirmative defense with respect to the statute of limitations is inappropriate to raise in a motion to dismiss, because "it is…likely that plaintiffs can raise factual setoffs." *Richards*, 662 F.2d at 73 ("a responding party often imposes an undue burden on the trial court and impedes the orderly administration of the lawsuit when he relies on a motion to dismiss to raise such an affirmative defense"). Because Plaintiffs do in fact raise such "factual setoffs," including allegations of fraudulent concealment that Defendants completely fail to address, Am. Comp. at ¶¶ 66-67, Defendants' motions to dismiss must fail. *See Richards*, at 73 n.13, citing *Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 235 (1959) (question of plaintiff's diligence "cannot be decided at this stage of the proceedings," on a motion to dismiss); *Jones v. Rogers Memorial Hospital*, 442 F.2d 773, 775 (D.C. Cir. 1971) (statute of limitations defense cannot be decided on a motion to dismiss "unless it appears beyond doubt" that plaintiff can prove no facts to entitle him to relief); *Houlihan v. Anderson-Stokes, Inc.*, 434 F. Supp. 1319, 1324 (D.D.C.1977) (issue of due diligence requires a finding of fact and thus is not suitable for determination on motion for judgment on the pleadings). The extent of financial cooperation among the

Defendants, in violation of federal election law, was not something Plaintiffs could have discovered until financial disclosures were made in FEC filings *after the conclusion of the 2004 election*. These facts raise issues that prevent the granting of a motion to dismiss on statue of limitations grounds. *See id.*

**V.      The *Noerr-Pennington* Doctrine Does Not Bar Plaintiffs' Claims.**

Defendants urge the Court to find that their conduct in this case is protected by the First Amendment right to petition the government, and consequently, that it is subject to immunity under the *Noerr-Pennington* doctrine. *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (extending *Noerr-Pennington* immunity to protect coordinated action in petitioning administrative agencies and courts). Defendants do not suggest that conspirators' acts of harassment, intimidation and sabotage are also protected under *Noerr-Pennington*, Am. Comp. at ¶¶ 67-71, but they assert that Plaintiffs can establish liability for those acts only by providing evidence that each conspirator's actions were specifically intended to further the wrongful conduct. *See N.A.A.C.P. v. Claiborne Hardware*, 458 U.S. 886, 919 (1982).

Defendants argument tortures the law on which it relies. While *California Motor Transport* extended *Noerr-Pennington* immunity to protect coordinated action in petitioning the courts, the Court noted that First Amendment rights may not be used as a means or pretext for achieving "substantive evils," such as abuse of the petitioning process. *See California Motor Transport*, 404 U.S. at 515.

> One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw. But once it is drawn, the case is established that abuse of those processes produced an illegal result.

*Id. at* 513. "[A]ctions of that kind," the Court concluded, "cannot acquire immunity by

seeking refuge under the umbrella of "political expression."" *Id.* Thus, as the Court

subsequently explained, *California Motor Transport* "held that the complaint showed a

sham not entitled to immunity when it contained allegations that a group sought to harm

its competitors by "instituting proceedings and actions…with or without probable cause,

and regardless of the merits of the cases." *Professional Real Estate Investors v. Columbia

Pictures Industries, Inc.*, 508 U.S. 49, 57 (1993), quoting *California Motor Transport*,

404 U.S. at 512.

   The import of *California Motor Transport* is that Defendants in this case may not

acquire absolute immunity for their conduct merely by asserting that it is petitioning

activity, and therefore protected as a form of political expression. *See California Motor

Transport*, 404 U.S. at 513. As the Court noted, the true nature of Defendants' conduct is

a question of fact, and "what the proof will show is not known." *Id.* at 515. For purposes

of a motion to dismiss, however, Plaintiffs' allegations must be taken as true, and these

allegations, "on their face…come within the "sham" exception in the *Noerr* case, as

adapted to the adjudicatory process." *Id.* at 515-16; *see also Pendleton Const. Corp. v.

Rockbridge County, Virginia*, 652 F. Supp. 312, 319 (W.D. Va. 1987) (*California Motor

Transport* "suggested that the sham exception would encompass other unethical conduct

in the setting of the adjudicatory process such as bribery, perjury, misrepresentation, or

the bringing of baseless, repetitive claims amounting to abuse of process").

   Defendants' reliance on *Claiborne Hardware* to shield themselves from liability

for conspirators' acts of harassment, intimidation and sabotage is also unfounded. In

*Claiborne Hardware*, a group of merchants sued two civil rights groups and several

individuals in tort for lost earnings the merchants sustained over the course of a boycott that the groups and individuals had organized. *See Claiborne Hardware*, 458 U.S. 886. The Mississippi Supreme Court held the entire boycott unlawful, and imposed joint and several liability on the groups and individuals for all damages resulting from the boycott. *See id.* The Supreme Court reversed, holding that the state could not impose liability on individuals based on nothing more than their association with a group. *See id.* at 918-20.

Defendants misread *Claiborne Hardware* to hold that a conspirator cannot be held liable for wrongful acts in furtherance of a conspiracy unless the conspirator specifically intended the wrongful act "according to the strictest law." *Claiborne Hardware* does not stand for this rule. Rather, *Claiborne Hardware* holds that, to impose liability on individuals based *only* on their association with a group, evidence must indicate that they have a specific intent to further the group's unlawful goals. *See Claiborne Hardware*, 458 U.S. at 919-20. *Claiborne Hardware* is therefore plainly inapplicable. Defendants' liability in this case is not premised upon their mere association with a group, but rather derives from their conduct in furtherance of an unlawful conspiracy. As such, Defendants are vicariously liable for damages caused by acts in furtherance of that unlawful conspiracy. *Halberstam*, 705 F.2d at 479.

**VI.    The Rooker-Feldman Doctrine Does Not Bar Plaintiffs' Claims.**

Defendants argue that Plaintiffs' claims should be dismissed pursuant to the *Rooker-Feldman* doctrine. As an initial matter, two recent decisions of the Supreme Court emphasize the narrow scope of the *Rooker-Feldman* doctrine, which has been extended "far beyond the contours of the *Rooker* and *Feldman* cases, overriding Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by

state courts, and superseding the ordinary application of preclusion law." *Lance v. Dennis*, 546 U.S. 459, 464 (2006) (reversing dismissal on *Rooker-Feldman* grounds), quoting *Exxon Mobil Corp. v. Saudi Basic Industries Corp*., 544 U.S. 280, 284 (2005) (same). Indeed, the Supreme Court noted that it had applied the doctrine only twice, in the two cases from which the name derives. *Exxon Mobil Corp.*, 544 U.S. at 283, citing *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). To the extent that Defendants attempt to extend the *Rooker-Feldman* doctrine beyond its proper application as announced in those two cases, therefore, their argument must be rejected. *See id.*

In *Exxon*, the Court held that the *Rooker-Feldman* doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  *Exxon Mobil Corp.*, 544 U.S. at 284. The doctrine is therefore plainly inapplicable to the present case. Plaintiffs do not seek review by this Court of the eighteen state court proceedings in which Defendants and their co-conspirators challenged Nader-Camejo nomination papers in the 2004 general election, nor do Plaintiffs seek rejection of those state court judgments. Rather, Plaintiffs seek damages arising from Defendants' unlawful conspiracy to cause Plaintiffs financial injury and other damages by initiating groundless and abusive litigation against them in eighteen state courts. Am. Comp. at ¶ 1.

In *Feldman*, the Court noted that federal courts are prohibited from exercising jurisdiction over issues actually decided by a state court, as well as those issues that are

"inextricably intertwined with the questions ruled upon by a state court." *Feldman*, 460 U.S. at 483. Defendants assert that Plaintiffs' claims are "inextricably intertwined" with the state court decisions on the merits of the Nader-Camejo nomination papers, but they provide no support for the claim. Federal courts, however, have clarified that federal claims are "inextricably intertwined" with a state court decision only "if success on the federal claim depends upon a determination that the state court wrongly decided the issues before it." *See Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 202-03 (4th Cir. 1997). Plaintiffs' claims do not depend in any way upon such a determination, and Defendants have not asserted that they do. Accordingly, the *Rooker-Feldman* doctrine does not bar Plaintiffs' claims. *See id.*

## VII. Plaintiffs Have Standing to Bring Their Claims.

Defendants argue that Plaintiffs do not have standing to bring their claims. As a preliminary matter, this argument consists largely of objections to factual allegations which, for purposes of Defendants' motions to dismiss, the Court must accept as true. *See Zinermon*, 494 U.S. at 118. Furthermore, Defendants fail to address Plaintiffs' allegations that the conspiracy caused Mr. Camejo at least $20,000 in damages, and that the conspiracy has placed Mr. Nader in imminent jeopardy of losing $61,638.45. Am. Comp. at ¶ 229. These errors and omissions render much of Defendants' standing argument inapplicable.

Plaintiffs clearly have standing as voters and candidates who personally suffered damage.[10] Defendants erroneously assert that Plaintiff-voters lack standing because they assert only a "generalized grievance." Thus, Defendants assert that nothing distinguishes

the voter Plaintiffs from all other voters in the seventeen states that denied Nader-Camejo ballot access in 2004. The superficial appeal of this assertion fades, however, when examined in the context of Plaintiffs' actual allegations: Plaintiffs do *not* allege that Defendants attempted to deny *all* voters their preferred choice of candidates, but only those voters who wished to vote for the Nader-Camejo ticket. Am. Comp. at ¶ 1. Moreover, Defendants specifically targeted this discrete minority of voters precisely *because* they wished to vote for Nader-Camejo. As members of the targeted class of voters, therefore, Plaintiff-voters do not allege a generalized grievance, but rather, a concrete injury specific to the minority of voters who wished to vote for Nader-Camejo in the 2004 general election. *Compare Shaw v. Hunt*, 517 U.S. 899, 904 (1996) (voters who live within racially gerrymandered voting district have standing to challenge legislation that created the district); *with United States v. Hays*, 515 U.S. 737, 738 (1995) (voters who do not live within racially gerrymandered district do not have standing to challenge legislation that created the district).

Defendants next assert that Defendants did not cause Plaintiffs' harm, because Defendants did not cause any state officer to deny Mr. Nader and Mr. Camejo ballot access, and because Defendants did not cause Mr. Nader to loan $100,000 to his campaign. Here, Defendants simply deny allegations that must be taken as true for purposes of ruling upon the motion to dismiss. Plaintiffs allege that Defendants conspired to cause them concrete and specific harm, and that Defendants did in fact cause such harm. Defendants offer alternative theories of causation to explain Plaintiffs' harm, but these alternative theories simply are not relevant. *See Friends for Ferrell Parkway v.*

---

[10] On March 7, 2008, a related case Plaintiffs filed in the District Court for the Eastern District of Virginia was transferred to this Court, and Plaintiffs expect it to be consolidated with the case at bar. The transferred

*Stasko*, 282 F.3d 315, 324 (4th Cir. 2002) ("the "fairly traceable" standard is not equivalent to a requirement of tort causation").

Finally, Defendants assert that Plaintiffs' alleged harms are not redressable. Plaintiffs allege that Defendants caused them financial injury and other damages by means of a conspiracy to pursue unfounded and abusive litigation against Plaintiffs, and that acts in furtherance of the conspiracy are ongoing. Notwithstanding Defendants' persistent denial of these allegations, which must be taken as true, Plaintiffs have standing based upon these allegations alone.

## VIII.   Plaintiffs' Request for Injunctive Relief Is Not Moot.

Defendants argue that Plaintiffs' request for injunctive relief is moot because the 2004 election has ended, thereby preventing the Defendants from engaging in the alleged violations that the requested injunctive relief would prevent. Defendants also argue that the "capable of repetition, yet evading review" exception does not apply, but they simply misstate the legal issue. The relevant question is not whether the 2004 election might recur, but whether Defendants' wrongful conduct during that election might recur. *See Murphy v. Hunt*, 455 U.S. 478, 482 (1982); *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975). Because such conduct "truly could be capable of repetition, yet evading review," Plaintiffs' claims are not moot. *Roe v. Wade*, 410 U.S. 113, 124-25 (1973); *see Honig v. Doe*, 484 U.S. 305, 318-19 n.6 (a "reasonable expectation" or recurrence suffices to avoid mootness, even if there is no "demonstrated probability" of the conduct recurring).

In addition, an action for injunction does not become moot merely because the conduct immediately complained of has terminated, if there is a sufficient possibility of a recurrence that would be barred by a proper decree. *See United States v. Concentrated*

action includes claims brought under 42 U.S.C. § 1983 to vindicate Plaintiffs' constitutional rights.

*Phosphate Export Ass'n*, 393 U.S. 199 (1968). Here, Plaintiffs allege that Defendants incorporated a Section 527 organization called The Ballot Project specifically for the purpose of coordinating and financing a conspiracy to sue Plaintiff Ralph Nader's presidential campaign, and that the organization did in fact do so. Am. Comp. at ¶¶ 5, 60. A sufficient possibility therefore exists that such conduct will resume now that Mr. Nader has announced that he is running for office again.[11] Accordingly, Plaintiffs' request for injunctive relief is not mooted by Defendants' voluntary cessation. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (plaintiffs' claims not moot where defendant was "still incorporated" and "could again decide" to engage in offending conduct); *Iron Arrow Honor Society v. Heckler*, 464 U.S. 67, 72 (1983) ("[d]efendants face a heavy burden to establish mootness" in voluntary cessation cases "because otherwise they would be 'free to return to [their] old ways' after the threat of a lawsuit had passed"), *quoting United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953).

Finally, Defendants assert that Plaintiff-voters only request injunctive relief, and that consequently they should be dismissed from the case. McAuliffe Mem. at 27. This argument is wrong as a matter of fact and as a matter of law. Plaintiff-voters seek damages for the deprivation of their constitutional rights, and they are entitled to such recovery. *See Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed"). Accordingly, Defendants' argument must fail, because Plaintiff-voters' claims are not moot.

---

[11] The Court may take judicial notice of newspaper articles and other public information. *See Heliotrope General, Inc.*, 189 F. 3d at 981 (9th Cir. 1999).

## **CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss should be denied.


Dated: March 31, 2008                           Respectfully Submitted,

                                                /s/ Oliver B. Hall
                                                _____

                                                Oliver B. Hall
                                                D.C. Bar No. 976463
                                                1835 16th Street, N.W.
                                                Washington, D.C. 20009
                                                (617) 953-0161
                                                oliverbhall@gmail.com

                                                *Counsel for Plaintiffs*


Bruce Afran, Esquire
10 Braeburn Drive
Princeton, NJ 08540
*Of Counsel*

Mark R. Brown, Esquire
303 East Broad Street
Columbus, OH 43215
*Of Counsel*

Carl J. Mayer, Esquire
Mayer Law Group, LLC
1040 Avenue of the Americas, Suite 2400
New York, NY 10018
*Of Counsel*

Gonzalez & Leigh, LLP
Matt Gonzalez, Esquire
G. Whitney Leigh, Esquire
Bryan Vereschagin, Esquire
Two Shaw Alley
San Francisco, CA 94105
*Of Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of March 2008, I electronically served a copy of the

foregoing Response in Opposition to Defendants' Motions to Dismiss by means of the

Court's CM/ECF system, or by first class mail, upon the following parties:

Joseph E. Sandler
D.C. Bar No. 255919
John Hardin Young
SANDLER, REIFF & YOUNG
50 E Street, S.E. #300
Washington, D.C. 20003

*Attorneys for Defendants Democratic
National Committee, Terry McAuliffe
and Jack Corrigan*

Lawrence Noble
D.C. Bar No. 24434
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM, LLP
1440 New York Ave., N.W.
Washington, D.C. 20005-2111

*Attorneys for Defendants
Toby Moffett, Robert Brandon,
Elizabeth Holtzman, Steven Raikin
and The Ballot Project, Inc.*

Laurence E. Gold
D.C. Bar No. 336891
LICHTMAN, TRISTER & ROSS, PLLC
1666 Connecticut Ave., N.W., Suite 500
Washington, D.C. 20009

Lyn Utrecht
D.C. Bar No. 272666
RYAN, PHILLIPS, UTRECHT
& MACKINNON
1133 Connecticut Ave., N.W.
Washington, D.C. 20036

*Attorneys for America Coming Together*

Michael B. Trister
D.C. Bar No. 54080
LICHTMAN, TRISTER & ROSS, PLLC
1666 Connecticut Ave., N.W., Suite 500
Washington, D.C. 20009

*Attorneys for Defendant Service Employees
International Union*

Mark E. Elias
D.C. Bar No. 442007
PERKINS COIE
607 14th St., N.W.
Washington, D.C. 20005

*Attorneys for Defendants Kerry-Edwards
2004, Inc. and Senator John Kerry*

Douglas K. Spaulding
D.C. Bar No. 936948
REED SMITH, LLP
1301 K Street N.W.
Suite 1100 – East Tower
Washington, D.C. 20005

*Attorneys for Defendant Reed Smith, LLP*

/s/ Oliver B. Hall
Oliver B. Hall

**IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | | |
|---|---|---|
| LINDA S. SERODY, RODERICK SWEETS, | : | |
| RONALD BERGMAN, TERRY TRINCLISTI, | : | |
| RICHARD TRINCLISTI, BERNIE COHEN- | : | |
| SCOTT, DONALD G. BROWN AND JULIA | : | |
| A. O'CONNELL | : | Case No.: 2007 003385 F |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| RALPH NADER, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| AMALGAMATED BANK, M&T BANK, | : | |
| and PNC BANK, | : | |
| | : | |
| Defendant Garnishees. | : | |

## DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT

Pursuant to Superior Court Civil Rule 60(b), Defendant Ralph Nader respectfully

moves the Court for relief from Plaintiffs' foreign judgment entered on May 16, 2007.

Defendant is entitled to such relief based on newly discovered evidence; fraud and other

misconduct of an adverse party; the denial of Defendant's right to due process; and due to

the extraordinary circumstances under which the judgment was rendered.  Accordingly,

Defendant moves the Court to vacate the judgment pursuant to Rule 60(b)(2), 60(b)(3),

60(b)(4) and 60(b)(6).

In the alternative, Defendant moves the Court to stay enforcement of the

judgment pursuant to Rule 62(b), and to accept Defendant's funds attached in these

proceedings as security pursuant to Rule 62-I, pending the Court's resolution of

Defendant's claims against Plaintiffs' counsel, Reed Smith, LLP in the action entitled *Nader v. Democratic National Committee*, Case No. 2007 CA 007245 B, now pending in this Court.

In support of Defendant's Motion for Relief, Defendant submits the attached Affidavit of Oliver B. Hall, Esquire, and a memorandum of points and authorities setting forth the grounds for Defendant's claims, copies of which have been served upon Plaintiffs' counsel, Reed Smith, and Defendant Garnishees Amalgamated Bank, PNC Bank and M&T Bank.

Respectfully submitted,

/s/ Oliver B. Hall

Date: November 7, 2007

Oliver B. Hall
D.C. Bar No. 976463
1673 Columbia Road NW
Washington, D.C. 20009
(617) 953-0161
*Counsel for Ralph Nader*

Bruce Afran, Esquire
10 Braeburn Drive
Princeton, NJ 08540
*Of Counsel*

Mark R. Brown, Esquire
303 East Broad Street
Columbus, OH 43215
*Of Counsel*

Carl J. Mayer, Esquire
Mayer Law Group, LLC
1040 Avenue of the Americas, Suite 2400
New York, NY 10018
*Of Counsel*

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION FOR RELIEF FROM JUDGMENT

This motion for relief arises from extraordinary circumstances.  On August 22, 2006, a divided Supreme Court of Pennsylvania affirmed an order directing Defendant Ralph Nader and his running mate Peter Miguel Camejo to pay $81,102.19 in litigation costs to Plaintiffs, who sued to challenge their nomination papers as candidates for President and Vice President in the 2004 General Election.  *See In re Nomination Papers of Ralph Nader and Peter Miguel Camejo*, 905 A.2d 450 (Pa. 2006).  This judgment appears to be unprecedented in American jurisprudence.  Indeed, the single case the majority cited as precedent actually *reversed* a taxation of costs against a candidate.  *See id.* (citing *In re Nominating Petition of Esther M. Lee*, 578 A.2d 1277 (Pa. 1990)).  Plaintiffs therefore ask this Court to enforce the first judgment in American history that effectively penalizes a candidate for attempting to run for office, much as poll taxes once penalized voters for attempting to vote.  *See Harper v. Virginia Bd. of Elections*, 383 U.S. 663 (1966) (striking down poll tax of $1.50).

Mr. Nader seeks relief from this unprecedented judgment based upon newly discovered evidence of undisclosed ties between Plaintiffs' counsel, Reed Smith, LLP, and four out of five members of the Supreme Court of Pennsylvania majority who voted to affirm the judgment.  Reed Smith's negligent or intentional concealment of these ties is misconduct that constitutes a fraud upon the court, requiring that the judgment be vacated.  These undisclosed ties give rise to an unavoidable appearance of impropriety, which required disclosure and, at least in some instances, disqualification of the Justices.  *See* PENNSYLVANIA CODE OF JUDICIAL CONDUCT Canon 2, 3(c) (2005) (requiring judges to avoid the appearance of impropriety and to disqualify themselves if their impartiality

might reasonably be questioned); *see also Reilly v. Southeastern Pennsylvania Transportation Authority*, 489 A.2d 1291, 1301 (Pa. 1985) (judges must disclose "any latent biases or personal interests which might possibly affect their judgment in the case").

The undisclosed ties giving rise to an appearance of impropriety in this case are as follows: 1) while this case was before the Supreme Court of Pennsylvania, Reed Smith began representing Chief Justice Ralph Cappy as his defense counsel in a state ethics investigation, thereby making the Chief Justice Reed Smith's client while he was presiding over these proceedings; 2) while this case was before the Supreme Court of Pennsylvania, Reed Smith and Plaintiffs' second law firm, Montgomery, McCracken, Walker and Rhoads, LLP, gave $10,000 in campaign contributions ($5,000 from each firm) to Justice Sandra Schultz Newman, who authored the majority opinion; 3) before Justice Ronald Castille joined the bench, Reed Smith's managing partner extended an open-ended offer of employment to him, which he accepted, and then served as of counsel at Reed Smith for almost three years immediately before joining the Supreme Court of Pennsylvania; 4) finally, Reed Smith, Reed Smith lawyers, and Montgomery, McCracken, Walker and Rhoads gave a combined total of at least $67,900 in campaign contributions to five out of six Justices who voted to award costs in Reed Smith's favor (four members of the majority and a Justice who concurred and dissented).

The appearance of impropriety arising from these relationships is manifest, and clearly raises reasonable questions as to the impartiality of the tribunal. In this case, moreover, the appearance of impropriety is compounded by Reed Smith's status not merely as Plaintiffs' counsel, but as the true party in interest seeking to collect litigation

costs in these proceedings.  Reed Smith's concealment of the firm's close personal,

professional and/or financial ties with five out of seven Justices presiding over

proceedings in which the firm had a direct and significant financial interest therefore

constitutes grounds for vacating the judgment.  *See Liljeberg v. Health Services*

*Acquisition Corp.*, 486 U.S. 847, 865 (1988) (judge's undisclosed relationship with

interested party warrants vacatur); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825

(1986) (judge's indirect financial interest in litigation warrants vacatur); *Scott v. United*

*States*, 559 A.2d 745 (D.C. 1989) (judge's undisclosed employment negotiations with

counsel's employer warrants vacatur); *see also Summers v. Howard University*, 374 F.3d

1188 (D.C. Cir. 2004) (party's prejudicial concealment of evidence warrants vacatur);

*Good Luck Nursing Home, Inc. v. Hariss*, 636 F.2d 572 (D.C. Cir. 1980) (party's failure

to make key facts known warrants vacatur); *Olivarius v. Stanley J. Sarnoff Endowment*,

858 A.2d 457 (D.C. 2004) (attorney's improper influence on court warrants vacatur);

*Miranda v. Contreras*, 754 A.2d 277 (D.C. 2000) (attorney's misrepresentation to

opposing counsel is "extraordinary circumstance" that warrants vacatur).

Relief is also warranted in this case because Reed Smith's concealment of the

firm's personal, professional and/or financial ties with five out of seven presiding Justices

violated Mr. Nader's right to due process.  *See In re Murchison*, 349 U.S. 133, 136

(1955) ("A fair trial in a fair tribunal is a basic requirement of due process"); *Klapprott v.*

*United States*, 335 U.S. 601, 615 (1949) ("Fair hearings are in accord with elemental

concepts of justice"); *see also Liljeberg*, 486 U.S. at 865 n.12 ("to perform its high

function in the best way, justice must satisfy the appearance of justice") (citations

omitted).

Accordingly, Mr. Nader is entitled to relief from the judgment under Rule 60(b) or, in the alternative, to a stay of proceedings to enforce the judgment under Rule 62(b), so that the Court may rule on the merits of Mr. Nader's claims against Plaintiffs' counsel Reed Smith, LLP, filed in this Court on October 30, 2007. *See Nader v. Democratic National Committee*, 2007 CA 007245 B (D.C. Super. Oct. 30, 2007).

## PROCEDURAL HISTORY AND FACTUAL BACKGROUND

### A. Procedural History

On August 9, 2004, Plaintiffs Linda S. Serody, Roderick J. Sweets, Ronald Bergman, Richard Trinclisti, Terry Trinclisti, Bernie Cohen-Scott, Donald G. Brown and Julia A. O'Connell filed a petition in the Commonwealth Court of Pennsylvania, which challenged the validity of the nomination papers that Defendant Ralph Nader and his running mate Peter Miguel Camejo submitted as candidates for President and Vice President in the 2004 General Election. *See In re Nomination Papers of Ralph Nader and Peter Miguel Camejo*, 905 A.2d 450, 453 (Pa. 2006). Pennsylvania's election code required the candidates to submit a petition with signatures equal in number to two percent of the number of the highest vote in the last statewide election. *See* 25 P.S. § 2911. In 2004, therefore, Mr. Nader and Mr. Camejo were required to submit 25,697 signatures. They submitted 51,273 signatures.

On October 13, 2004, the Commonwealth Court issued an opinion setting aside Mr. Nader's and Mr. Camejo's nomination papers. *See In re Nomination Papers of Nader*, 865 A.2d 8 (Pa. Commw. Ct. 2004). The Commonwealth Court invalidated approximately 30,500 signatures on technical grounds – for example, because qualified electors were not registered on the day they signed the petition (9,000 signatures

invalidated); because omitted data like dates or incomplete addresses was filled in after electors signed the petition (8,000 signatures invalidated); because the elector's current address did not match the elector's registered address (6,000 signatures invalidated); because information was incomplete (2,000 signatures invalidated); because of "affidavit problems" (2,000 signatures invalidated); and because of unspecified "other" defects (3,500 signatures invalidated). *Id.* The Commonwealth Court thus found only 18,818 signatures valid, and concluded that the nomination papers fell short of the 25,697 signatures required by state law. *Id.* The next day, on October 14, 2004, the Commonwealth Court issued an order directing Mr. Nader and Mr. Camejo to pay all costs arising from Plaintiffs' lawsuit challenging their nomination papers.

On October 19, 2004, the Supreme Court of Pennsylvania issued a *per curiam* order affirming the Commonwealth Court's disposition of the nomination papers without opinion. *See In re Nader*, 905 A.2d at 455. Only Justice Thomas Saylor, who dissented, issued a written opinion. *See In re Nomination of Nader*, 580 Pa. 134 (Pa. 2004) (Saylor, J. dissenting). Justice Saylor objected, *inter alia*, to the Commonwealth Court's invalidation of approximately 9,000 signatures from qualified electors, noting that Pennsylvania law does not require qualified electors to register to vote before signing a nomination petition. *See id.* For this reason alone, Justice Saylor argued, the nomination petition exceeded state law requirements, and Mr. Nader and Mr. Camejo qualified for Pennsylvania's 2004 general election ballot. *See id.*

On December 3, 2004, Plaintiffs' counsel, Reed Smith (joined by Gregory Harvey of Montgomery, McCracken, Walker and Rhoads and Brian A. Gordon, a solo practitioner) submitted a bill of costs to the Commonwealth Court in the amount of

$81,102.19.  On January 14, 2005, the Commonwealth Court issued an order approving

the bill without opinion.  Mr. Nader and Mr. Camejo appealed this order to the Supreme

Court of Pennsylvania, which assumed jurisdiction on October 13, 2005, and heard oral

argument on March 1, 2006.  On August 22, 2006, a divided Supreme Court of

Pennsylvania  affirmed.  *See In re Nader*, 905 A.2d at 460.  Justice Saylor and Justice

Eakin dissented on the ground that Pennsylvania's Election Code does not authorize the

state to tax costs against candidates who defend their nomination papers, but only against

petitioners who challenge them.  *See id.* (Saylor, J. dissenting and Eakin, J. concurring

and dissenting).  Justice Eakin concurred in part, on the ground that the court's Internal

Operating Procedures may have provided authority for approximately half the costs

assessed. *See id.* (Eakin, J. concurring and dissenting).

The Supreme Court of the United States denied Mr. Nader's and Mr. Camejo's

petition for a writ of certiorari on January 8, 2007.  *See In re Nomination Paper of Ralph

Nader*, 127 S. Ct. 995 (Jan. 8, 2007).  On April 23, 2007, the Pennsylvania

Commonwealth Court entered its order of January 14, 2005 as a final judgment.

Plaintiffs entered this foreign judgment in the Superior Court of the District of Columbia

on May 16, 2007.

Because Reed Smith concealed the aforementioned ties to the Pennsylvania

Supreme Court Justices, Mr. Nader and Mr. Camejo did not discover them until

sometime after September 12, 2007, when an article about Chief Justice Ralph Cappy's

retirement noted that Justice Ronald Castille had formerly served as of counsel at Reed

Smith.  *See* Gina Passarella, *Pa. Supreme Court Chief Justice to Step Down from Bench*,

THE LEGAL INTELLIGENCER, Sep. 12, 2007.  Mr. Camejo had already paid Reed Smith

6

$20,000 in settlement, unaware that the firm's judgment was tainted with an appearance of impropriety.  Mr. Nader, having received notice of potential conflicts of interest involving Reed Smith, thereafter discovered the following facts that give rise to this motion for relief.

On October 30, 2007, Mr. Nader filed suit in this Court charging Reed Smith, *inter alia*, with conspiracy, abuse of process and malicious prosecution.  The case is now pending.  *See Nader v. Democratic National Committee*, 2007 CA 007245 B (D.C. Super. Oct. 30, 2007).

**B.  Undisclosed and Concealed Ties Between Reed Smith and Justices of the Pennsylvania Supreme Court**

**1.  Reed Smith Represented Chief Justice Ralph Cappy as His Defense Counsel in an Ethics Investigation While He Presided over this Proceeding in which Reed Smith Has a Direct and Significant Financial Interest.**

On August 15, 2005, a citizen filed a complaint against Pennsylvania Supreme Court Chief Justice Ralph Cappy before the state Judicial Conduct Board.  The complaint requested the board to investigate whether Chief Justice Cappy violated the Pennsylvania Code of Judicial Conduct by advocating pay raises for government officials, including the judiciary, and by holding secret meetings with unidentified members of the state's executive and legislative branches.  *See* Mark Scolforo, *Probe Asked of Justice Cappy's Role in Pay Raises*, ASSOCIATED PRESS, Aug. 15, 2005.  Thereafter, Justice Cappy retained Reed Smith to defend him in the proceedings.  On November 11, 2005, W. Thomas McGough, Jr., a partner in Reed Smith's Pittsburgh office, wrote a letter to the board "on behalf of my client, The Honorable Ralph J. Cappy," in which he presented Chief Justice Cappy's defense.  *See* Exhibit A, Reed Smith Justice Cappy Letter.  The

Pennsylvania Supreme Court assumed jurisdiction over the present case on October 13, 2005. Chief Justice Cappy was therefore presiding over these proceedings, in which Reed Smith had a direct and significant financial interest as the true party in interest, while Reed Smith was defending Chief Justice Cappy in another proceeding of a highly sensitive nature. Reed Smith neither disclosed that the firm was representing Chief Justice Cappy, nor moved for his disqualification at any time during these proceedings before Chief Justice Cappy voted to affirm the unprecedented $81,102.19 judgment in Reed Smith's favor.

> **2. Reed Smith and Plaintiffs' Second Law Firm Gave Justice Sandra Schultz Newman $10,000 in Campaign Contributions While She Presided over this Proceeding in which Reed Smith Has a Direct and Significant Financial Interest.**

In the first week of November 2005, while this case was before the Pennsylvania Supreme Court, Reed Smith and Plaintiffs' second law firm, Montgomery, McCracken, Walker and Rhoads, gave Justice Sandra Schultz Newman $10,000 in campaign contributions ($5,000 from each firm). *See* Asher Hawkins, *Report: Newman Aided by Late $320K*, THE LEGAL INTELLIGENCER, Dec. 12, 2005. The contributions were part of a large influx of cash, all contributed during the first week of November 2005, which was widely credited with enabling Justice Newman to "narrowly escape[] being voted off the bench." *Id.* Reed Smith and Montgomery, McCracken, Walker and Rhoads contributed the $10,000 after the Pennsylvania Supreme Court assumed jurisdiction over the present case on October 13, 2005, less than six months before oral argument on March 1, 2006, and less than a year before Justice Newman wrote the majority opinion awarding judgment in Reed Smith's favor, announced on August 22, 2006. Reed Smith and Attorney Harvey of Montgomery, McCracken, Walker and Rhoads neither disclosed that

the firms had given $10,000 in campaign contributions to Justice Newman, nor moved

for her disqualification at any time during these proceedings before Justice Newman

voted to affirm the unprecedented $81,102.19 judgment in Reed Smith's favor.

**3. Reed Smith Extended a Long-Standing, Open-Ended Offer of Employment to Justice Ronald Castille, which He Accepted and Served as of Counsel at Reed Smith for Almost Three Years Immediately Before Joining the Court.**

In 1991, William Meehan, a partner in Reed Smith's Philadelphia office and the

city's Republican Party leader, wanted to recruit then-District Attorney Ronald Castille to

run as the party's candidate for mayor of Philadelphia. After a year-long courtship, "the

moment of truth" reportedly came for Justice Castille "around a conference table at the

law offices of Reed Smith," where he told Mr. Meehan and several advisors, "I'll go for

it." *See* S.A. Paolantonio, *Castille Seen as Both Hero and Villain in Republican Drama*,

PHILADELPHIA INQUIRER, Feb. 17, 1991. Immediately thereafter, Justice Castille was

reported to be negotiating with Reed Smith for a job after he resigned as District Attorney

to run for mayor – a deal some criticized as a kickback. *See* Cynthia Burton, *A Firm*

*Offer for Castille?*, PHILADELPHIA DAILY NEWS, Feb. 22, 1991. The deal, reportedly,

was that Justice Castille agreed to resign from his $79,000-a-year job as District Attorney

to run for mayor only after Reed Smith guaranteed him a $130,000-a-year job at the firm

if he lost the primary election. *See* Katharine Seelye, *Castille Keeps Cool in Court Run*,

PHILADELPHIA INQUIRER, April 30, 1993. Justice Castille did lose the primary, and he

accepted Reed Smith's offer in March 1991.

In a press release dated March 15, 1991, Reed Smith announced that Justice

Castille had joined the firm as counsel in its Philadelphia office. The press release stated:

> Reed Smith's association with Castille began when Castille first ran for the position of Philadelphia district attorney in 1985. At that time, Reed Smith asked him to join the firm, and that interest has continued through his two terms as district attorney. When Castille was elected as district attorney, [managing partner David C.] Auten and others at Reed Smith asked Castille to *contact them if he was interested in a position with the firm at any time in the future.* *See* Exhibit B, Reed Smith Justice Castille Press Release (emphasis added).

Mr. Auten characterized Reed Smith's 1985 offer as "dormant" until Justice Castille accepted it in 1991. *See* Cynthia Burton, *A Firm Offer for Castille?*, PHILADELPHIA DAILY NEWS, Feb. 22, 1991. Reed Smith thus extended an open-ended offer of employment to Justice Castille, which endured for seven years until Justice Castille accepted it in 1991. Justice Castille then served of counsel at Reed Smith for nearly three years immediately before joining the Pennsylvania Supreme Court in January 1994. Nevertheless, Reed Smith neither disclosed the firm's long-standing political and professional ties with Justice Castille, nor moved for his disqualification at any time during these proceedings before Justice Castille voted to affirm the unprecedented $81,102.19 judgment in Reed Smith's favor.

### 4. Reed Smith, Reed Smith Lawyers and Plaintiffs' Second Law Firm Gave a Combined Total of at Least $67,900 in Campaign Contributions to Five Out of Six Justices Who Voted to Award Costs in Reed Smith's Favor.

Reed Smith, Reed Smith lawyers and Plaintiffs' second law firm, Montgomery, McCracken, Walker and Rhoads gave a combined total of at least $67,900 in campaign contributions to five out of six Justices who voted to award costs in Reed Smith's favor. At least $58,900 of this total came from Reed Smith and its lawyers. By contrast, neither firm nor any lawyers associated with them gave campaign contributions to the lone dissenter, Justice Thomas Saylor. Despite the unavoidable appearance of impropriety arising from such contributions, which is compounded in this case by Reed Smith's status

not merely as Plaintiffs' counsel, but as the true party in interest seeking to collect

litigation costs in these proceedings, neither Reed Smith nor Attorney Harvey of

Montgomery, McCracken, Walker and Rhoads disclosed that the firms had given a

combined total of at least $67,900 in campaign contributions to five out of seven

presiding Justices of the Pennsylvania Supreme Court, nor moved for their

disqualification at any time during these proceedings before the Justices voted to affirm

the unprecedented $81,102.19 judgment in Reed Smith's favor.

### C. Facts Indicating Widespread Recognition that the Ties Between Reed Smith and the Pennsylvania Supreme Court Justices Create an Appearance of Impropriety

Pennsylvania's legal and lay communities widely recognize that undisclosed ties

between judges and parties who come before them in court create an appearance of

impropriety.  *See, e.g.*, H.G. Bissinger and Daniel R. Biddle, *Politics in Justice: Fuel for

Suspicion*, PHILADELPHIA INQUIRER, Jan. 28, 1986 (relating lawyers' reactions to such

undisclosed ties, including, "That's outrageous"); Daniel R. Biddle, *Fear Contributes to

Lawyer Donations*, PHILADELPHIA INQUIRER, May 15, 1983 (quoting lawyers who say

they and "any other lawyer in town" feel their interests will suffer in court if they do not

contribute to judges' campaigns, and that, "For the Supreme Court…if you give less than

[$1,000] you look like you're a chintz"); Daniel R. Biddle, *Above the Law*,

PHILADELPHIA INQUIRER, May 15, 1983 ("Incredible!  How can they accept that?  Talk

about a conflict of interest!  I mean, I'm a lawyer. Think of how it appears to clients:

Three of the judges got thousands of campaign dollars from the people we're against!").

As Attorney General, Governor Edward G. Rendell also criticized lawyers and

judges who fail to disclose such ties.  *See* Bissinger and Biddle, *Politics in Justice*

(quoting Rendell, "What goes on is influence peddling…from lawyers who have close relationships with judges and may have helped in their political campaigns").  Prominent members of the legal community agree.  *See* H.G. Bissinger and Daniel R. Biddle, *How Political Interests Stand in the Way of Change*, PHILADELPHIA INQUIRER, Jan. 31, 1986 (quoting former chancellor of the Philadelphia Bar Association, Bennett G. Picker, "Specifically, the problem arises with judges and judge candidates campaigning among lawyers who may appear before some of these judges at a later date"); Asher Hawkins, *Retention Campaign Funding Increasing, Drawing Concern*, THE LEGAL INTELLIGENCER, Dec. 22, 2005 (quoting Lynn Marks, executive director of Pennsylvanians for Modern Courts, "The perception is always there – even if it has no basis in reality – that there might be preference in court given to the contributors").

Finally, many Pennsylvania judges recognize the appearance of impropriety arising from judges' undisclosed ties with parties who appear before them in court.  The trial judge in this very case, for example, recently acknowledged that campaign contributions specifically can give rise to the appearance of impropriety.  *See* Marc Levy, *James Gardner Colins Stepping Down from Commonwealth Court*, ASSOCIATED PRESS, Oct. 3, 2007.  Many more judges agree.  *See* Bissinger and Biddle, *Politics in Justice* (Common Pleas Court Judge Albert F. Sabo: "They should pass a law that no lawyer can contribute to a judge," because "even subconsciously, you're going to feel you owe [the contributor] a favor"); *id.* (Superior Court President Judge Edmund B. Spaeth Jr.: "Suppose you're before the court and you know your opponent's lawyer has made a contribution.  That shouldn't be.  It's inconsistent with the appearance of impartiality"); *id.* (Common Pleas Court Judge Victor J. DiNubile Jr.: "You're asking [for contributions

12

from] people that come before you [in court], and it may not look proper"); *id.* (Common Pleas Court President Judge Edward J. Bradley: "The whole situation is a troublesome one"); *id.* (Commonwealth Court Judge James Gardner Colins: "When the public reads this, their eyebrows are going to be arched"); Biddle, *Above the Law* (former Pennsylvania Supreme Court Justice James McDermott: "You have a point…someone could feel uncomfortable with that").

Despite this widespread criticism, some Pennsylvania law firms, including Reed Smith, now contribute to both judicial candidates in a single election, thereby guaranteeing that the firm will have supported the winner's campaign. *See* Peter Jackson, *Some Law Firms Give Money to Both Supreme Court Candidates*, ASSOCIATED PRESS, Nov. 1, 2003 (noting that Reed Smith donated $5,000 to Justice Max Baer in 2003 and $7,000 to his opponent).

**D. Facts Indicating that Plaintiffs' Unprecedented Judgment Relies on a False Factual Conclusion that the Record Contradicts**

This litigation took place in a highly charged political atmosphere, which made national headlines as part of a nationwide effort by the Democratic Party to use litigation to bankrupt Mr. Nader's 2004 presidential campaign in order "to keep him from becoming a factor in [the] election." Katharine Q. Seelye, *Democrats' Legal Challenges Impede Nader*, N.Y. TIMES, Aug. 19, 2004; *see Nader v. Democratic National Committee*, 2007 CA 007245 B (D.C. Super. Oct. 30, 2007) (complaint filed alleging abuse of process, malicious prosecution and related claims). Commonwealth Court President Judge James Gardner Colins, who was elected to the bench as a Democrat, presided over the proceedings.

Judge Colins found that 49,499 out of 51,273 signatures on the Nader-Camejo nomination petition were either valid, or invalid on technical grounds. *See In re Nomination Papers of Nader*, 865 A.2d 8 (Pa. Commw. Ct. 2004). Judge Colins counted another 1,087 signatures as duplicates. *See id.* Finally, Judge Colins counted 687 signatures, or 1.3 percent of the total, as "forgeries." *See id.* This category denoted fake names, apparently resulting from sabotage or mischief by signers, that campaign staff did not detect in a review conducted prior to submitting the petition, and which they voluntarily withdrew immediately upon discovery, in a good faith effort to lessen the Commonwealth Court's burden. *See In re Nader*, 580 Pa. 134, _ n.13 (Saylor, J., dissenting).

After summarizing these findings, which confirm that 98.7 percent of the signatures on the Nader-Camejo nomination petition were free from any allegation of fraud, Judge Colins nevertheless concluded that the petition was "the most deceitful and fraudulent exercise ever perpetrated upon this Court," and that the petition included "thousands of names that were created at random." *In re Nader*, 865 A.2d 8. According to Judge Colins' own findings, however, this conclusion is a mathematical impossibility. *See id.* Judge Colins counted 49,499 signatures either as valid, or invalid on technical grounds, and another 1,087 as duplicates. *See id.* Judge Colins therefore found that 50,586 signatures out of 51,273 were free from any allegation of fraud – making it numerically impossible that the petition included "thousands" of fraudulent signatures. *See id.*

Pennsylvania Supreme Court Justice Saylor, who was the only Justice to address the merits of Judge Colins' findings, accordingly found that the record does not support

Judge Colins' conclusion. *See In re Nader*, 580 Pa. at _ n.13. In fact, Justice Saylor specifically noted that the record contains "no evidence" to support Judge Colins' allegations. *Id.* The majority, by contrast, issued a *per curiam* order affirming without opinion, and subsequently adopted Judge Colins' false conclusion without analysis, and relied on this falsehood as justification for affirming the unprecedented $81,102.19 judgment in Reed Smith's favor. *See id*; *In re Nader*, 905 A.2d 450.

## ARGUMENT

A foreign judgment properly filed in the Superior Court of the District of Columbia "shall…be subject to the same procedures, defenses or proceedings for reopening, vacating or staying as a judgment of the Superior Court." D.C. Code § 15-352 (2006). The proper procedure for vacating a foreign judgment, therefore, is to file a motion pursuant to Rule 60(b). *See Threatt v. Winston*, 907 A.2d 780, 787-88 (D.C. App. 2006). Upon such motion, the Court is authorized to examine issues of fact as necessary to determine whether relief is warranted. *See id.* at 790; *Jones v. Hersh*, 845 A.2d 541, 545 (D.C. 2004); *Leichtman v. Koons*, 527 A.2d 745, 748 (D.C. 1987). In addition, federal court decisions interpreting the identical federal Rule 60 are "persuasive authority in interpreting the local rule." *Id.* at 784 n.8 (citations omitted).

### I.    Plaintiffs' Judgment Must Be Vacated.

#### A.  Plaintiffs' judgment must be vacated based on newly discovered evidence.

The newly discovered evidence in this case creates an appearance of impropriety that requires vacatur by this Court. Vacatur based on newly discovered evidence is required if the evidence is in fact newly discovered after trial; if its recent discovery was

15

not due to a lack of diligence by the movant; and if the evidence is not merely cumulative or impeaching, but would probably produce a different result if a new trial were granted. *See Oxendine v. Merrell Dow Pharmaceuticals*, 563 A.2d 330, 334 (D.C. App. 1989) (citations omitted). The newly discovered evidence in this case – that Reed Smith had undisclosed ties to five out of six Justices who voted to award costs in the firm's favor – clearly meets that standard.

The newly discovered evidence in this case was in fact discovered after trial, on or about September 12, 2007, when Mr. Nader first learned of Reed Smith's undisclosed ties to the Justices. These undisclosed ties consequently placed the Justices in a position that violated the Canons of Judicial Conduct, as well as the Pennsylvania Supreme Court's prior decisions governing disclosure. *See* PENNSYLVANIA CODE OF JUDICIAL CONDUCT Canon 2, 3(c) (2005) (requiring judges to avoid the appearance of impropriety and to disqualify themselves if their impartiality might reasonably be questioned); *Reilly*, 489 A.2d at 1301 (judges must disclose "any latent biases or personal interests which might possibly affect their judgment in the case"). Any neglect in this case is therefore chargeable not to Mr. Nader, but to Reed Smith or the Justices themselves. *See Reilly*, 489 A.2d at 1300 (impartiality of judiciary is presumed); *see also Liljeberg*, 486 U.S. at 867 (judge's silence deprived party of basis for making a timely motion for a new trial); *United States v. Microsoft*, 253 F.3d 34, 112 (D.C. Cir. 2001) (judge's secrecy prevented the parties from objecting to his improprieties or seeking his removal); *see also United States v. Heldt*, 668 F.2d 1238, 1271 (D.D.C. 1981) (judge must disqualify from any case in which appearance of impropriety is "sufficient to permit the average citizen reasonably to question [the] judge's impartiality").

Had Reed Smith's ties to the Justices been disclosed as required by law and applicable ethical standards, the disclosure most certainly would have produced a different result.  First, Mr. Nader would have had the opportunity to move for the Justices' disqualification.  *See Commonwealth v. Whitmore*, 912 A.2d 827 (Pa. 2006) (proper procedure when question is raised as to judge's impartiality is to file petition for disqualification); *Commonwealth v. Druce*, 848 A.2d 104 (Pa. 2004) (same); *Reilly*, 489 A.2d 1299 (same).  Second, even if that motion were denied, the issue nevertheless would have been preserved for appeal.  *Reilly*, 489 A.2d at 1300.  Third, a strong likelihood exists that, upon disclosure of these, one or more of the Justices would have disqualified themselves, consistent with the canons of judicial conduct and the Pennsylvania Supreme Court's prior decisions.  *See id*; PENNSYLVANIA CODE OF JUDICIAL CONDUCT Canon 2, 3(c).

Accordingly, pursuant to Rule 60(b)(2), this Court should vacate the judgment based on newly discovered evidence that would produce a different result if a new trial were granted.

### B.  Plaintiffs' judgment must be vacated based on fraud, misrepresentation, or other misconduct of an adverse party amounting to a fraud upon the court.

The question presented by a motion to vacate is whether "there is a greater risk of unfairness in upholding the judgment…than there is in allowing a new judge to take a fresh look at the issues."  *Liljeberg*, 486 U.S. at 868.  This case does not present a close question.  Mr. Nader, through no fault of his own, was totally unaware of the information necessitating post-judgment relief until September 12, 2007.  Reed Smith, by contrast, knew or should have known of its undisclosed ties with the Justices of the Pennsylvania

Supreme Court while this case was before that court – particularly the fact that Chief

Justice Ralph Cappy was a client in an ongoing ethics investigation.  As a matter of

fairness and equity, therefore, the motion for relief should be granted.  *See Miranda*, 754

A.2d 277 (vacatur warranted because "counsel should not be able to reap the windfall of

his or her misrepresentation to fellow counsel").

   The manifest impropriety arising from these undisclosed ties is compounded,

moreover, by Reed Smith's status not merely as Plaintiffs' counsel in this case, but as the

true party in interest seeking to collect litigation costs.  Reed Smith's negligent or

intentional concealment of these ties therefore constitutes misconduct that warrants

vacatur.  *See Summers*, 374 F.3d 1188 (party's prejudicial concealment of evidence

warrants vacatur); *Good Luck Nursing Home, Inc.*, 636 F.2d 572 (party's failure to make

key facts known warrants vacatur); *Miranda*, 754 A.2d 277 (attorney's misrepresentation

to opposing counsel warrants vacatur).

   Reed Smith's misconduct also warrants vacatur because it rises to the level of a

fraud upon the court.  *See Olivarius*, 858 A.2d at 465 n.4 ("Because attorneys are officers

of the court, their dishonest participation in the concealment of evidence or other

wrongdoing may transform a "garden-variety" fraud claim into a claim of fraud upon the

court").  Reed Smith concealed facts forming a basis for the Justices' disqualification,

which directly impinges the integrity of the court and its ability to function impartially.

*See id.* at 465 ("Fraud on the court . . . is fraud which is directed to the judicial machinery

itself").  Moreover, the concealment of these ties actually prevented Mr. Nader from

making a motion for the Justices' disqualification.  *See id.* at 465-66  Vacatur is thus

warranted on the alternative ground that Reed Smith's misconduct constituted a fraud upon the court.  *See id.*

Accordingly, pursuant to Rule 60(b)(3), this Court should vacate the judgment due to fraud, misrepresentation or other misconduct of an adverse party amounting to a fraud upon the court.

### C.  **Plaintiffs' judgment must be vacated because it was obtained in violation of due process.**

The appearance of impropriety in this case also requires vacatur, because it is so pervasive that it "taints the entire proceeding" and therefore violates due process.  *Scott v. United States*, 559 A.2d at 752 (citation omitted); *see Aetna*, 475 U.S. at 825 ("We are not required to decide whether in fact [the judge] was influenced," because "justice must satisfy the appearance of justice"); *In re Murchison*, 349 U.S. at 136 ("A fair trial in a fair tribunal is a basic requirement of due process"); *Klapprott*, 335 U.S. at 615 ("Fair hearings are in accord with elemental concepts of justice").  Accordingly, Plaintiffs' judgment is not entitled to full faith and credit from this Court, because "*due process requires that no other jurisdiction shall give effect, even as a matter of comity, to a judgment elsewhere acquired without due process.*"  *Griffin v. Griffin*, 327 U.S. 220, 228-29 (1946) (emphasis added).

This case fails to satisfy the "appearance of justice" because the majority opinion affirming the judgment relies on a false factual conclusion and cites no legal precedent to support the court's taxation of costs against a candidate.  *Aetna*, 475 U.S. at 825; *see In re Nader*, 905 A.2d 450 (citing one case as precedent, in which costs taxed against a candidate were actually *reversed*).  The record therefore permits an inference of improper influence.  *See Aetna*, 475 U.S. at 822 (conflicted judge "quite possibly made new law;

the court's opinion does not suggest that its conclusion was compelled by earlier

decisions"). The fact that Justice Saylor dissented, and was free from any appearance of

impropriety, further supports this inference, and warrants vacatur. *See In re Nader*, 580

Pa. at _ n.13 (Saylor, J., dissenting) (the record contains "no evidence" to support

majority's conclusions); *see also Liljeberg*, 486 U.S. 847 (vacating judgment where judge

failed to disclose relationship with interested party); *Aetna*, 475 U.S. 813 (vacating

judgment where judge participated as plaintiff in similar litigation); *Microsoft*, 253 F.3d

34 (vacating sentencing decision where judge secretly disparaged defendant prior to

sentencing); *Scott*, 559 A.2d 745 (vacating judgment where judge was negotiating for

employment with one of the parties).

Accordingly, pursuant to Rule 60(b)(4), this Court should vacate the judgment as

void and unenforceable, because it was rendered in violation of due process.

### D. Plaintiffs' judgment must be vacated due to the extraordinary circumstances under which it was obtained.

Under "extraordinary circumstances," the Court may vacate a judgment where

necessary to accomplish justice. *Liljeberg*, 486 U.S. at 863, citing *Klapprott*, 335 U.S. at

614-615. Such extraordinary circumstances are present here: the judgment is tainted with

a pervasive appearance of impropriety; was secured by misconduct amounting to a fraud

upon the court; and lacks a reasonable basis in law and fact. Moreover, the party in

interest gave five out of six Justices who voted to affirm the judgment in whole or in part

a combined total of at least $67,900 in campaign contributions, which the party concealed

rather than prompting the Justices to disclose. Reed Smith's representation of one Justice

at the very time this matter was pending before the Pennsylvania Supreme Court, and the

firm's open-ended offer of employment to another Justice, comprise two unacceptable

and undisclosed relationships between the litigant and the court that destroy any semblance of due process.

Accordingly, pursuant to Rule 60(b)(6), this Court should vacate the judgment as unenforceable due to the extraordinary circumstances under which it was obtained.

II.     **In the Alternative, the Court Should Stay Enforcement of Plaintiffs' Judgment Pending Resolution of Defendant's Claims.**

A.     **Plaintiffs' judgment should be stayed pending resolution of Defendant's claims against Plaintiffs' counsel Reed Smith, which is the true party in interest in these proceedings.**

Where a plaintiff seeks enforcement of a foreign judgment in this Court by means of attachment and condemnation proceedings, and the defendant does not defend against the judgment, but asserts claims against the plaintiff, proper procedure is to stay entry of final judgment for plaintiff "until determination of [defendant's] counterclaim when adjustment of the rights of the parties may be made." *Graham Associates v. Fell*, 192 A.2d 129 (D.C. 1963) (trial court erred by entering final judgment and awarding execution by condemnation of attached funds where defendant asserted counterclaims). Accordingly, in the alternative to vacating the judgment under Rule 60(b), the Court should stay proceedings to enforce the judgment pursuant to Rule 62, pending the Court's resolution of Mr. Nader's claims raised in the complaint filed with this Court on October 30, 2007. *See Nader v. Democratic National Committee*, C.A. No. 2007 CA 007245 B.

Respectfully submitted,

/s/ Oliver B. Hall
_____

Oliver B. Hall
D.C. Bar No. 976463
1835 16th Street NW
Washington, D.C. 20009

21

(617) 953-0161
*Counsel for Ralph Nader*

Date:   November 7, 2007

Bruce Afran, Esquire
10 Braeburn Drive
Princeton, NJ 08540
*Of Counsel*

Mark R. Brown, Esquire
303 East Broad Street
Columbus, OH 43215
*Of Counsel*

Carl J. Mayer, Esquire
Mayer Law Group, LLC
1040 Avenue of the Americas, Suite 2400
New York, NY 10018
*Of Counsel*

**IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | | |
|---|---|---|
| **LINDA S. SERODY, RODERICK SWEETS, RONALD BERGMAN, TERRY TRINCLISTI, RICHARD TRINCLISTI, BERNIE COHEN-SCOTT, DONALD G. BROWN AND JULIA A. O'CONNELL** | : : : : : | **Case No.: 2007 003385 F** |
| **Plaintiffs,** | : : | |
| **v.** | : : | |
| **RALPH NADER,** | : : | |
| **Defendant,** | : : | |
| **and** | : : | |
| **AMALGAMATED BANK, M&T BANK, and PNC BANK,** | : : : | |
| **Defendant Garnishees.** | : | |

## <u>ORDER</u>

And now, this ___ day of September, 2007, Defendant Ralph Nader's Motion for

Relief from Judgment is granted, and Plaintiffs' foreign judgment filed in this Court on

May 16, 2007, is hereby vacated.  So ordered.

_____
The Honorable Judge Judith Bartnoff
District of Columbia Superior Court

**cc:**    Daniel I. Booker, Esq.
Reed Smith LLP
1301 K Street NW
Suite 1100 – East Tower
Washington, DC 20005
*Counsel for Plaintiffs*

Joel Gold, Esq.
PNC Bank
500 First Avenue
Pittsburgh, PA 15219
*Counsel for PNC Bank*

Sue Chen, Esq.
Deborah Silodor, Esq.
Amalgamated Bank
275 7th Avenue
New York, NY 10001
*Counsel for Amalgamated Bank*

Barbara Petruso, Esq.
334 Delaware Avenue
Buffalo, NY 14202
*Counsel for M&T Bank*

Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219-1886
412.288.3131
Fax 412.288.3063

**W. Thomas McGough, Jr.**
Direct Phone: 412.288.3088
Email: wmcgough@reedsmith.com

November 11, 2005

**VIA FACSIMILE TO 717-234-9307**
**AND U.S. MAIL**

Joseph A. Massa, Jr., Esquire
Chief Counsel
Commonwealth of Pennsylvania
Judicial Conduct Board
Pennsylvania Place
301 Chestnut Street
Suite 403
Harrisburg, Pennsylvania  17101

> Re:    <u>Complaint Filed by Gene Stilp</u>

Dear Mr. Massa:

I write on behalf of my client, The Honorable Ralph J. Cappy, Chief Justice of the Commonwealth of Pennsylvania.  As you know, the media has reported that, on or about August 15, 2005, a self-styled "political activist," Gene Stilp, filed a complaint with the Judicial Conduct Board accusing Chief Justice Cappy of supposed misconduct.  Although neither Chief Justice Cappy nor I have seen the actual complaint submitted by Mr. Stilp, my client would like to have this matter resolved as quickly as possible and therefore has authorized me to submit a response to those charges that were reported by the media.

As we understand it, Mr. Stilp's complaint focuses on efforts Chief Justice Cappy has made to secure adequate compensation for judicial officers serving the Commonwealth of Pennsylvania and on a public statement issued by Chief Justice Cappy supporting the enactment of a comprehensive plan for compensation of Pennsylvania's public officials.  Any fair assessment of the Chief Justice's actions in this regard, we submit, would mandate the immediate dismissal of that complaint.

<u>**Background**</u>

Chief Justice Cappy is now serving his second ten-year term on the Supreme Court of Pennsylvania, having begun his service on January 1, 1990.  He was installed as Chief Justice of Pennsylvania on January 3, 2003.

Chief Justice Cappy was graduated from the University of Pittsburgh with a Bachelor of Science in 1965 and with a Juris Doctor in 1968.  After completing law school, he served as a law clerk to the President Judge of the Court of Common Pleas of Allegheny County and then engaged in the general practice of law.  He became a Public Defender for Allegheny County, and ultimately served as Chief Public Defender from 1976 to 1978.  In July 1979, Chief Justice Cappy was appointed to the Allegheny

PGHLIB-1706291.1-WTMCGOUG 2/14/06 8:59 AM

Joseph A. Massa, Jr., Esquire
November 11, 2005
Page 2



County Court of Common Pleas, and served in the Family, Criminal and Civil Divisions of that Court. In 1986, he was appointed as Administrative Judge of the Civil Division, a position he held until he joined the Supreme Court in 1990.

Article V of the Constitution of the Commonwealth of Pennsylvania establishes our "unified judiciary" (section 1) and vests the Supreme Court of Pennsylvania with "supreme judicial power" (section 2). According to Article V, section 10, the Supreme Court is to exercise "general supervisory and administrative authority over all the courts and justices of the peace."

As the leader of the Court vested with the supreme judicial power and with supervisory and administrative responsibility for the entire unified judicial system, Chief Justice Cappy has communicated frequently and necessarily with members of the other two branches of Pennsylvania's government. The subjects of these communications have included the annual budget for the judicial system, continuing judicial and legal education, the proposed Unified Judicial Center in Harrisburg, the organization and management of the Administrative Office of Pennsylvania Courts, the Pennsylvania Commission of Judicial Independence, and the Gender, Racial, and Ethnic Fairness Commission, to name but a few. The communications and interactions have been of all types and levels of formality, from testimony before the Legislature, to one-on-one meetings with leaders of the other two branches of government, to written statements and proposals, to innumerable telephone conversations with innumerable officials of the Commonwealth. On some occasions, these interactions were requested or invited, on others they were initiated by the Chief Justice. In all cases, they have been directed at advancing the administration of justice in the Commonwealth of Pennsylvania.

## The Judicial Compensation Proposal

Chief Justice Cappy has for some time been concerned about the inadequate compensation available to the judges and other judicial officers upon whom the fair and efficient administration of justice depends. Over the past decade, judicial salaries in Pennsylvania have eroded significantly when compared with judicial salaries in other states, at the same time that compensation for lawyers in private practice has trended upward. As a result, many newly graduated law students can make as much in private practice as a seasoned trial judge on a Court of Common Pleas. Highly valued jurists have reluctantly departed the bench for opportunities in the private sector.

Sometime in the late summer or early fall of 2004, the Chief Justice asked the leaders of the legislature and the Governor to confront this growing problem with a proposal to increase compensation for the judiciary. In a series of meetings and conversations, he laid out a number of different approaches to accomplish this goal, including but not limited to a compensation package that tied salaries to those of the federal judiciary. In those discussions, he made it very clear that he was asking for a raise for the judiciary, whether it be in the form of a traditional, lump sum increase or in a more innovative form. He did point out that linking salaries to those of the federal judiciary would help to insure independence of the judiciary by ensuring that future compensation increases for the judiciary would no longer be in the hands of the Pennsylvania sister branches, but instead in the hands of Congress and the President of the United States. Because of his desire to guarantee judicial independence, the Chief Justice preferred the approach of removing the pay raise issue from the political forum in the future. He felt even more strongly, however, that, after ten years of minimal increases, the judges of Pennsylvania needed and deserved a significant increase in compensation, regardless of the form it might take.

As Chief Justice Cappy discussed his proposal with representatives of the sister branches of government, it became clear to him that its best chance of success would be as part of a broader reform of compensation for all three branches. He therefore developed and began to discuss scenarios that would tie pay in those branches to counterparts in the federal system.

Joseph A. Massa, Jr., Esquire
November 11, 2005
Page 3



By the spring of 2005, the Chief Justice was informed that the respective legislative caucuses were considering the comprehensive approach, with the Legislature devising its own package and the Executive Branch doing the same. A consensus seemed to be emerging at that time that a comprehensive compensation package was the most desirable way in which to proceed and that the Chief Justice's suggestions as to the judicial piece of the package would be acceptable. All involved acknowledged that tying all salaries to federal counterparts was meritorious because it would remove future issues over compensation from the political arena.

Sometime during the budget session of the Legislature in June of 2005, one of the chambers of the Legislature drafted a Comprehensive Compensation Bill that included the Judiciary and tied the salaries of Pennsylvania justices and judges to their federal counterparts. Further, consistent with the Chief Justice's suggestions, the salaries of magisterial district judges were set at 50% of the salary of a Common Pleas Court Judge. It should be noted that because the proposal for the Pennsylvania Judiciary set salaries for justices and judges at one step below the federal counterpart, there were no comparable federal officials with whom to compare the salaries of magisterial district judges. Thus, the salaries of the magistrates were set at 50% of the salary of a common pleas court judge.

Neither the Chief Justice nor any of his colleagues were present in the Capitol during the final days of the 2005 budget debate or during the final vote on either the 2005/2006 budget or the comprehensive compensation package.

During his first press conference after he signed the legislation, Governor Rendell publicly thanked "Chief Justice Cappy for having come up with the idea of linking state salaries to their federal counterparts." This "thank you" was unsolicited and undoubtedly well intended, but sparked a torrent of commentary over the Chief Justice's role in what had become a political controversy of major proportions. Over the next several weeks, the Chief Justice watched as his effort to address a burgeoning crisis in the judiciary was transformed in the media into a last minute, late hour "fast one" pulled by the legislature. Additionally, because of the Governor's above noted comments, the Chief Justice's role in the matter was being described in a wholly misleading manner.

The Chief Justice believed – and still believes – that the public was being badly informed about what had occurred, and that the Governor and Legislature were being unfairly criticized for what he believed to be an important and progressive step for state government. He therefore wrote and distributed an op ed piece (copy enclosed) to set the record straight regarding the need for a judicial pay increase and regarding the time and effort that went into this thoughtful and progressive plan. He also participated in a few interviews on this subject with representatives of the media.

## <u>Analysis</u>

Article V, section 18 of the Constitution of the Commonwealth of Pennsylvania sets forth the circumstances under which a justice, judge, or justice of the peace may be sanctioned by the Court of Judicial Discipline. Without even seeing the complaint sent to the JCB by Mr. Stilp, we are confident that none of the conduct described above – nor any of the Chief Justice's actions in pursuit of fair compensation for Pennsylvania's judicial officers – fall within any of the proscriptions of section 18. On the contrary, as head of the judiciary in this Commonwealth, Chief Justice Cappy is legally and ethically obliged to pursue initiatives aimed at improving the administration of justice. He, and he alone, is in a position to represent and speak out on behalf of the unified judicial system established by Article V.

The Code of Judicial Conduct, far from prohibiting the activities at issue here, specifically authorizes them. Canon 4 provides, "A judge may engage in activities to improve the law, the legal system, and the administration of justice." Canon 4(A) permits a judge to "speak, write, lecture, teach,

Joseph A. Massa, Jr., Esquire
November 11, 2005
Page 4



and participate in other activities concerning the law, the legal system, and the administration of justice[,]" while Canon 4(B) states that a judge may "consult with an executive or legislative body or official . . . on matters concerning the administration of justice."  All of Chief Justice Cappy's activities in support of enhanced compensation for Pennsylvania's judicial officers has fallen comfortably within these rules.

Several news articles about Mr. Stilp's complaint suggested that he had alleged that Chief Justice Cappy's actions were improper because the legality of the legislation raising compensation might come before the Pennsylvania Supreme Court for decision.  But, as the Chief Justice repeatedly indicated to those who were considering his proposals, he would and will recuse himself from any case presenting that issue.  He also had instructed his colleagues on the Supreme Court that they were not to become involved with his proposals, so that they could adjudicate any such matter.

For all these reasons, the complaint submitted by Mr. Stilp should be dismissed without further involvement or investigation by the Judicial Conduct Board.  Should that step in fact be taken, I would request that the Board notify me of this disposition.

Please feel free to contact me if you or the Board need any further information.

Very truly yours,


W. Thomas McGough, Jr.
Pa. I.D. No. 28328

WTMcG,Jr:cag

cc:    Honorable Ralph J. Cappy

PR Newswire

March 15, 1991, Friday - 11:31 Eastern Time

FORMER DISTRICT ATTORNEY RONALD CASTILLE JOINS REED SMITH
SHAW & MCCLAY

**SECTION:** State and Regional News

**LENGTH:** 412 words

**DATELINE:** PHILADELPHIA, March 15

David C. Auten, managing partner of the Philadelphia office of Reed Smith Shaw &
McClay, announced today that former Philadelphia District Attorney Ronald Castille had
become counsel to the firm.

Reed Smith Shaw & McClay is a firm of approximately 350 lawyers with offices in
Philadelphia, Pittsburgh, Washington, Harrisburg, Pa., and McLean, Va. With its
Philadelphia office founded in 1842, Reed Smith is a full-service firm.

Reed Smith's association with Castille began when Castille first ran for the position of
Philadelphia district attorney in 1985. At that time, Reed Smith asked him to join the
firm, and that interest has continued through his two terms as district attorney. When
Castille was elected as district attorney, Auten and others at Reed Smith asked Castille to
contact them if he was interested in a position with the firm at any time in the future.

Auten said he expects Castille to be a significant contributor to the firm's litigation team.
He has personally handled 180 jury trials, almost all of them with successful outcomes.
He has successfully supervised the work of more than 200 attorneys and a staff of
475 employees while district attorney.

Reed Smith's Philadelphia Litigation Group has been one of the fastest growing groups in
the firm. In the past 10 years, that group has grown from one lawyer to nearly 30. Within
litigation, one of the most rapidly growing areas is white-collar crime.

Reed Smith also has long had an extensive practice in representing various branches of
government, including the City of Philadelphia. The firm first served the City as counsel
on a bond issue at the beginning of this century, and has performed legal work for the
City in virtually every administration, Democratic and Republican, in the past 90 years.

Castille will not be the first Reed Smith attorney to seek public office while at the firm.
Philander Knox, a founder of the firm, served as U.S. attorney general and secretary of
State and as a U.S. senator. David Reed, another member of the firm also served as a U.S.
senator.

Reed Smith has been actively seeking senior litigators to help in its dramatic growth, and the firm said it is delighted to add as prominent a practicing attorney as Castille to its ranks. Auten said Castille will begin work as soon as the furniture can be moved into his new office.

CONTACT: Richard H. Glanton of Reed Smith Shaw & McClay, 215-851-8120.

## AFFIDAVIT OF OLIVER B. HALL IN SUPPORT
## OF MOTION FOR RELIEF FROM JUDGMENT

1.      I am a member of the Bar of the District of Columbia, and counsel for

Defendant Ralph Nader. I submit this affidavit in support of Defendant's Motion for

Relief from Judgment.

2.      On August 9, 2004, Plaintiffs Linda S. Serody, Roderick J. Sweets,

Ronald Bergman, Richard Trinclisti, Terry Trinclisti, Bernie Cohen-Scott, Donald G.

Brown and Julia A. O'Connell filed a petition in the Commonwealth Court of

Pennsylvania, which challenged the validity of the nomination papers that Defendant

Ralph Nader and his running mate Peter Miguel Camejo submitted as candidates for

President and Vice President in the 2004 General Election. *See In re Nomination Papers*

*of Ralph Nader and Peter Miguel Camejo*, 905 A.2d 450, 453 (Pa. 2006). Pennsylvania's

election code required the candidates to submit a petition with signatures equal in number

to two percent of the number of the highest vote in the last statewide election. *See* 25

P.S. § 2911. In 2004, therefore, Mr. Nader and Mr. Camejo were required to submit

25,697 signatures. They submitted 51,273 signatures.

3.      On October 13, 2004, the Commonwealth Court issued an opinion setting

aside Mr. Nader's and Mr. Camejo's nomination papers. *See In re Nomination Papers of*

*Nader*, 865 A.2d 8 (Pa. Commw. Ct. 2004). The Commonwealth Court invalidated

approximately 30,500 signatures on technical grounds – for example, because qualified

electors were not registered on the day they signed the petition (9,000 signatures

invalidated); because omitted data like dates or incomplete addresses was filled in after

electors signed the petition (8,000 signatures invalidated); because the elector's current

address did not match the elector's registered address (6,000 signatures invalidated);

1

because information was incomplete (2,000 signatures invalidated); because of "affidavit problems" (2,000 signatures invalidated); and because of unspecified "other" defects (3,500 signatures invalidated). *Id.* The Commonwealth Court thus found only 18,818 signatures valid, and concluded that the nomination papers fell short of the 25,697 signatures required by state law. *Id.*

4.     On October 14, 2004, the Commonwealth Court issued an order directing Mr. Nader and Mr. Camejo to pay all costs arising from Plaintiffs' lawsuit challenging their nomination papers.

5.     On October 19, 2004, the Supreme Court of Pennsylvania issued a *per curiam* order affirming the Commonwealth Court's disposition of the nomination papers without opinion. *See In re Nader*, 905 A.2d at 455. Only Justice Thomas Saylor, who dissented, issued a written opinion. *See In re Nomination of Nader*, 580 Pa. 134 (Pa. 2004) (Saylor, J. dissenting). Justice Saylor objected, *inter alia*, to the Commonwealth Court's invalidation of approximately 9,000 signatures from qualified electors, noting that Pennsylvania law does not require qualified electors to register to vote before signing a nomination petition. *See id.* For this reason alone, Justice Saylor argued, the nomination petition exceeded state law requirements, and Mr. Nader and Mr. Camejo qualified for Pennsylvania's 2004 general election ballot. *See id.*

6.     On December 3, 2004, Plaintiffs' counsel, Reed Smith (joined by Gregory Harvey of Montgomery, McCracken, Walker and Rhoads and Brian A. Gordon, a solo practitioner) submitted a bill of costs to the Commonwealth Court in the amount of $81,102.19. On January 14, 2005, the Commonwealth Court issued an order approving the bill without opinion. Mr. Nader and Mr. Camejo appealed this order to the Supreme

2

Court of Pennsylvania, which assumed jurisdiction on October 13, 2005, and heard oral argument on March 1, 2006. On August 22, 2006, a divided Supreme Court of Pennsylvania affirmed. *See In re Nader*, 905 A.2d at 460. Justice Saylor and Justice Eakin dissented on the ground that Pennsylvania's Election Code does not authorize the state to tax costs against candidates who defend their nomination papers, but only against petitioners who challenge them. *See id.* (Saylor, J. dissenting and Eakin, J. concurring and dissenting). Justice Eakin concurred in part, on the ground that the court's Internal Operating Procedures may have provided authority for approximately half the costs assessed. *See id.* (Eakin, J. concurring and dissenting).

7.    The Supreme Court of the United States denied Mr. Nader's and Mr. Camejo's petition for a writ of certiorari on January 8, 2007. *See In re Nomination Paper of Ralph Nader*, 127 S. Ct. 995 (Jan. 8, 2007). On April 23, 2007, the Pennsylvania Commonwealth Court entered its order of January 14, 2005 as a final judgment. Plaintiffs entered this foreign judgment in the Superior Court of the District of Columbia on May 16, 2007.

8.    On September 12, 2007, or shortly thereafter, Defendant Ralph Nader discovered for the first time that Supreme Court of Pennsylvania Justice Ronald Castille formerly served as of counsel at Plaintiffs' law firm Reed Smith, LLP, for three years immediately prior to joining that Court. Because Reed Smith concealed this fact, Mr. Nader and Mr. Camejo did not discover it until it was published in an article about Chief Justice Ralph Cappy's retirement. *See* Gina Passarella, *Pa. Supreme Court Chief Justice to Step Down from Bench*, THE LEGAL INTELLIGENCER, Sep. 12, 2007. Mr. Camejo had

3

already paid Reed Smith $20,000 in settlement, unaware that the firm's judgment was tainted with an appearance of impropriety.

9.    Discovery of Reed Smith's association with Justice Castille put Mr. Nader on notice that Reed Smith might have further undisclosed ties with Justices of the Pennsylvania Supreme Court. Upon investigation, Mr. Nader discovered that further undisclosed ties do in fact exist.

10.    Specifically, on September 12, 2007, or shortly thereafter, Mr. Nader discovered that Reed Smith was representing (now former) Pennsylvania Supreme Court Chief Justice Ralph Cappy in a state ethics investigation, which was ongoing while this case was before the Pennsylvania Supreme Court. That Court assumed jurisdiction over this case on October 13, 2005. On November 11, 2005, Reed Smith partner W. Thomas McGough, Jr. sent a letter to the Commonwealth of Pennsylvania Judicial Conduct Board setting forth Chief Justice Cappy's response to charges against him.

11.    On September 12, 2007, or shortly thereafter, Mr. Nader also discovered that Reed Smith and Plaintiffs' second law firm, Montgomery, McCracken, Walker and Rhoads, LLP, gave $10,000 in campaign contributions ($5,000 from each firm) to Justice Sandra Schultz Newman while this case was before the Pennsylvania Supreme Court. Reed Smith gave $5,000 on November 4, 2005, and Montgomery, McCracken, Walker and Rhoads gave $5,000 on November 7, 2005.

12.    On October 30, 2007, Mr. Nader filed suit in this Court charging Reed Smith, *inter alia*, with conspiracy, abuse of process and malicious prosecution. The case is now pending. *See Nader v. Democratic National Committee*, 2007 CA 007245 B (D.C. Super. Oct. 30, 2007).

4

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 7th day of November, 2007

Oliver B. Hall
D.C. Bar No. 976463
1835 16th Street NW
Washington, D.C. 20009
(617) 953-0161
*Counsel for Ralph Nader*

District of Columbia : SS
The foregoing instrument was acknowledged before me this 7 day of November, 2007
by
Jacqueline Williams, Notary Public, D.C.
My commission expires August 14, 2008

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Motion for Relief from Judgment and proposed

Order was served upon the following persons on November 8, 2007 by First Class mail:


Daniel I. Booker, Esq.
Reed Smith LLP
1301 K Street NW
Suite 1100 – East Tower
Washington, DC 20005
*Counsel for Plaintiffs*

Joel Gold, Esq.
PNC Bank
500 First Avenue
Pittsburgh, PA 15219
*Counsel for PNC Bank*

Sue Chen, Esq.
Deborah Silodor, Esq.
Amalgamated Bank
275 7th Avenue
New York, NY 10001
*Counsel for Amalgamated Bank*

Barbara Petruso, Esq.
334 Delaware Avenue
Buffalo, NY 14202
*Counsel for M&T Bank*


/s/ Oliver B. Hall
Oliver B. Hall
D.C. Bar No. 976463
1835 16th Street NW
Washington, D.C. 20009
(617) 953-0161
*Counsel for Ralph Nader*