# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RALPH NADER *et al.*,    :
           :
    Plaintiffs,  :  Civil Action No.:  07-2136 (RMU)
           :
    v.    :  Document Nos.:  28, 29, 30, 31, 32, 34
           :
THE DEMOCRATIC NATIONAL :
COMMITTEE *et al.*,    :
           :
    Defendants.  :

## MEMORANDUM OPINION

### GRANTING THE DEFENDANTS' MOTIONS TO DISMISS

## I. INTRODUCTION

In 2000, Ralph Nader campaigned for the presidency of the United States and earned over 2.8 million votes, 2.74 percent of all votes cast. In 2004, he again threw his hat in the ring, this time garnering only 465,650 votes, a sliver more than one-third of one percent of the total vote and less than one-fifth of the amount he collected in 2000.[1] Rather than attributing his poor showing to public disenchantment with independent candidates following the closely divided 2000 presidential election or an unpopular platform or any one of the array of reasons that voters choose one candidate over another, Nader, along with Peter Camejo (his 2004 running mate) and six voter plaintiffs hailing from Arizona, Ohio and Oregon allege that the defendants, the Democratic National Committee ("DNC"), DNC attorney Jack Corrigan, DNC consultant Robert Brandon, Michigan Democratic Party Chair and DNC Vice Chair Mark Brewer, John Kerry, the Democratic Party's presidential nominee in 2004, Kerry-Edwards 2004, Inc., The Ballot Project,

---

[1]   Figures on the 2000 election are available at http://www.fec.gov/pubrec/fe2000/prespop.htm. 2004 election figures may be found at http://www.fec.gov/pubrec/fe2004/tables.pdf.

Inc. and its president Toby Moffett and director Elizabeth Holtzman, America Coming Together ("ACT"), Service Employees International Union ("SEIU") and the law firm Reed Smith, LLP, engineered his defeat by conspiring to deprive him of votes and campaign cash via ballot eligibility challenges in multiple suits across the country. Specifically, the plaintiffs charge the defendants with civil conspiracy, malicious prosecution and abuse of process.

The defendants move to dismiss, arguing that the plaintiffs have failed to state a claim, that the relevant statutes of limitation bar suit and that the defendants' actions are protected as the exercise of their First Amendment right of petition. They further argue that this court lacks jurisdiction because the plaintiffs lack standing, that the plaintiffs' request for injunctive relief is moot and that the plaintiffs' claims must be dismissed because they invite the review and rejection of a state-court judgment rendered before proceedings commenced in federal court. Because this court lacks jurisdiction to consider the plaintiffs' malicious prosecution claims that directly attack prior state court judgments, and because the First Amendment bars the remaining claims, the courts grants the defendants' motions to dismiss and dismisses the amended complaint.

## II. BACKGROUND

### A. Factual History

The plaintiffs allege that the defendants conspired to file twenty-four complaints in eighteen state courts and five complaints before the Federal Election Commission ("FEC")

within a twelve-week period between June and September of 2004.  Am. Compl. ¶ 3.[2]  Seeking

to improve John Kerry's chances by removing Nader as a competitor from the race, the

defendants brought multiple challenges to Nader's candidacy not, the plaintiffs insist, "to

vindicate valid legal claims, but rather to bankrupt Nader-Camejo's campaign by forcing the

candidates to spend their limited resources of time, talent and money on the defense of

unfounded lawsuits."  *Id.* ¶ 4.  Nader eventually loaned his own campaign $100,000 "to cover

legal bills, staff salaries and operating expenses," which the campaign never paid back.  Am.

Compl. ¶ 228.  Ultimately, the FEC dismissed the complaints, and the defendants prevailed in

only five states – Arizona, Illinois, Ohio, Oregon and Pennsylvania – in keeping Nader off the

ballot.  *Id.* ¶ 4; DNC's Mot. to Dismiss, Ex. 1.  In Pennsylvania defendant Reed Smith secured an

$81,102.19 judgment against Nader personally for litigation costs, for which the firm brought

attachment proceedings in D.C. Superior Court for $61,638.45.  Am. Compl. ¶ 229.

### B.  Procedural History

The plaintiffs filed a complaint in the Superior Court for the District of Columbia on

October 30, 2007, accusing the defendants of conspiracy and abuse of process and malicious

prosecution in Arizona, Arkansas, Colorado, District of Columbia, Florida, Illinois, Iowa, Maine,

Michigan, Mississippi, Nevada, New Hampshire, New Mexico, Ohio, Oregon, Pennsylvania,

Washington, West Virginia and Wisconsin.  Compl. ¶¶ 238-43.  The complaint also alleged

conspiracy and violations under 42 U.S.C. § 1983 of the Qualifications Clause and the First and

Fourteenth Amendments of the U.S. Constitution.  *Id.* ¶¶ 244-55.  On October 31, 2007, the

---

[2]       The amended complaint includes two consecutive paragraphs so designated.  The court refers here to the latter.

plaintiffs filed a similar complaint in the Eastern District of Virginia raising the same constitutional claims against different defendants. On November 27, 2007, the Superior Court defendants removed the case to this court. On January 23, 2008, the plaintiffs amended their complaint, deleting the counts alleging constitutional violations. The plaintiffs also filed a motion to remand but withdrew the motion on March 13, 2008, a day after the Eastern District of Virginia transferred its case to this court after denying the plaintiffs leave to amend and denying without prejudice the defendants' pending motions to dismiss. No motion to consolidate these actions has been filed, and no pending motions remain in the action transferred from the Eastern District of Virginia. The court's opinion today, therefore, considers only the pending motions to dismiss in the action raising state tort claims removed from the Superior Court.

## III.  ANALYSIS

### A.  Standing

#### 1.  Legal Standard for a Motion to Dismiss Pursuant to Rule 12(b)(1)

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938); *see also Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) (noting that "[a]s a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction").

Because "subject-matter jurisdiction is an 'Art. III as well as a statutory requirement[,] no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v.*

*Compagnie des Bauxite de Guinea*, 456 U.S. 694, 702 (1982)). On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing by a preponderance of the evidence that the court has subject-matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The court may dismiss a complaint for lack of subject-matter jurisdiction only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Empagran S.A. v. F. Hoffman-Laroche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

Because subject-matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Thus, the court is not limited to the allegations contained in the complaint. *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). When necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

## 2. Legal Standard for Standing

Article III of the Constitution limits the jurisdiction of federal courts to cases or controversies. U.S. CONST. art. III, § 2, cl. 1. These prerequisites reflect the "common understanding of what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better*

*Env't*, 523 U.S. 83, 102 (1998). Consequently, "a showing of standing is an essential and unchanging predicate to any exercise of a court's jurisdiction." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing standing. *Defenders of Wildlife*, 504 U.S. at 561; *Steel Co.*, 523 U.S. at 104; *City of Waukesha v. Envtl. Prot. Agency*, 320 F.3d 228, 233 (D.C. Cir. 2003) (per curiam). The extent of the plaintiff's burden varies according to the procedural posture of the case. *Sierra Club v. Envtl. Prot. Agency*, 292 F.3d 895, 898-99 (D.C. Cir. 2002). At the pleading stage, general factual allegations of injury resulting from the defendant's conduct will suffice. *Id.*

To demonstrate standing, a plaintiff must satisfy a three-pronged test. *Sierra Club*, 292 F.3d at 898 (citing *Defenders of Wildlife*, 504 U.S. at 560). First, the plaintiff must have suffered an injury in fact, defined as a harm that is concrete and actual or imminent, not conjectural or hypothetical. *Byrd v. Envtl. Prot. Agency*, 174 F.3d 239, 243 (D.C. Cir. 1999) (citing *Steel Co.*, 523 U.S. at 103). Second, the injury must be fairly traceable to the governmental conduct alleged. *Id.* Finally, it must be likely that the requested relief will redress the alleged injury. *Id.* Our court of appeals has made clear that no standing exists if the plaintiff's allegations are "purely speculative[, which is] the ultimate label for injuries too implausible to support standing." *Tozzi v. Dep't of Health & Human Servs.*, 271 F.3d 301, 307 (D.C. Cir. 2001). Nor is there standing where the court "would have to accept a number of very speculative inferences and assumptions in any endeavor to connect the alleged injury with [the challenged conduct]." *Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C. Cir. 1980).

6

### 3. The Court Dismisses the Voter Plaintiffs from the Amended Complaint

The defendants raise a number of threshold objections to the plaintiffs' standing to bring this case. Starting with the six voter plaintiffs, SEIU urges that, as the amended complaint no longer alleges any constitutional violations, the voter plaintiffs cannot remain in this action based solely on the "common-law torts arising from litigation against Nader-Camejo in which none of the voter plaintiffs were involved." SEIU's Mot. to Dismiss at 22. The plaintiffs respond that the transferred action from the Eastern District of Virginia does include constitutional claims and that they "expect it to be consolidated with the case at bar." Pls.' Opp'n at 34 n.10.

These motions to dismiss are ripe now, however. And the plaintiffs have not translated their future expectation into any present action. Nor have they sought to reinstate their constitutional claims in this complaint. The only injury the voter plaintiffs allege is the denial of their constitutional right to a "free choice of candidates." Am Compl. ¶¶ 231-321. But they were not parties to the ballot litigation in any state. They do not even allege that they were petitioners inconvenienced by compulsory process in these suits. Nor do they allege that they incurred any financial injury as a consequence of the defendants' litigation.[3] To allow the voter plaintiffs to sue for abuse of process and malicious prosecution in regards to litigation in which they played no part and by which they were only derivatively affected would constitute a bold, even reckless extension of the doctrines of justiciability restricting federal-court jurisdiction. *See, e.g.*,

---

[3]    The amended complaint mentions a voter plaintiff in particular only once, stating that "conspirators . . . organized a campaign of harassing phone calls to the office of Plaintiff-voter Gregory Kafoury, which was serving as Nader-Camejo's nomination headquarters," thus "incapacitat[ing] the office phones for the entire day." Am. Compl. ¶ 169. The plaintiffs do not cite it as support for their standing, nor could they as it is not a cognizable harm on which to base a malicious prosecution or abuse of process claim.

*Chapman v. Anderson*, 3 F.2d 336, 339 (D.C. Cir. 1925) (holding that an action for malicious prosecution requires the establishment, *inter alia*, of the fact that the defendant prosecuted the plaintiff); *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 829 F. Supp. 420, 426 (D.D.C. 1993) (dismissing abuse of process and malicious prosecution claims on account of plaintiff's lack of privity with defendants); *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C. 1980) (holding that an abuse of process claim requires proof that "process has been used to . . . compel[] the party against whom it is used to do some collateral thing which he could not legally and regularly be required to do").[4]  The proposition that the voter plaintiffs cannot remain in this action by piggybacking on the Nader-Camejo plaintiffs' common-law claims[5] being self-evident, the court dismisses the voter plaintiffs from this action.

### 4. Nader and Camejo Sufficiently Demonstrate Standing

The defendants next challenge the standing of Nader and Camejo.  Nader contends that the defendants' litigiousness distracted him and his campaign from seeking votes and compelled him to loan $100,000 to his own campaign "to cover legal bills, staff salaries and operating expenses," which the campaign never repaid.  Am. Compl. ¶ 228.  Moreover, Nader and Camejo represent that defendant Reed Smith obtained a judgment of costs against Nader and Camejo in a

---

[4]     One might note that, even assuming the voter plaintiffs had alleged an injury-in-fact, prudential standing considerations would impede their progress to the courthouse.  *See Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (holding that prudential standing encompasses "the general prohibition on a litigant's raising another person's legal rights") *and  Warth v. Seldin*, 422 U.S. 490, 500-01 (1975) (recognizing that while standing "in no way depends on the merits of the plaintiff's contention that particular conduct is illegal" it "often turns on the nature and source of the claim asserted" such that a court must consider whether the law grants a right of action to persons "seek[ing] relief on the basis of the legal rights and interests of others").

[5]     The question of whether the voter plaintiffs have Article III standing to bring their *constitutional* claims raised in the action transferred from the Eastern District of Virginia is an entirely separate question not before the court.

Pennsylvania court and, subsequently, commenced attachment proceedings against $61,638.45 of Nader's personal funds in D.C. Superior Court and induced Camejo to pay $20,000 to settle its claim against him. *Id.* ¶ 229.

SEIU argues that Nader's campaign loan is not an injury because he made it voluntarily[6] and has not demonstrated that the amount and purpose of the loan was to compensate for costs imposed on the campaign by the defendants. SEIU's Mot. to Dismiss at 22 n.14. Similarly, the DNC argues that the plaintiffs have not shown how the defendants prevented the Nader-Camejo campaign from repaying the loan. DNC's Mot. to Dismiss at 17. As for Nader and Camejo's personal financial losses, the DNC insists that the Pennsylvania court's order is not part of the alleged conspiracy to deprive the plaintiffs of ballot access. DNC's Reply at 6. Moreover, for the court to remedy that loss would require it to overrule the Pennsylvania Supreme Court, a result barred by the *Rooker-Feldman* doctrine. *Id.* Additionally, the defendant questions whether any financial loss is redressable, as the campaign is the entity that owes Nader money and is

---

[6] The source for this proposition is *McConnell v. Federal Election Comm'n*, in which the Court traced the electoral-candidate plaintiffs' alleged inability to compete to their "wish" not to solicit or accept large contributions rather than to increased hard-money limits under campaign finance law allowing the plaintiffs' opponents to raise more money. *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 228 (2003). The circumstances of Nader's decision were quite different, however. In *McConnell*, the new campaign finance law changed the rules of the playing field for everyone, and the plaintiffs, presented with the opportunity to exploit the new contribution limits or abstain, chose the latter. In the 2004 election, the instant defendants allegedly singled out Nader and subjected him to a barrage of litigation, the costs of which he attempted to mitigate through a personal loan to his campaign – the only choice available to him if he wanted to remain a candidate. Thus, *McConnell* is distinguishable.

beyond the court's jurisdiction because it is not a party.[7]  *Id.* at 20.  The plaintiffs maintain that standing requires one only to show that an injury is traceable to the defendant, not to meet the burden of production on the causation element of a tort claim.  Pls.' Opp'n at 35-36.

The plaintiffs correctly point out that the "fairly traceable" standard is not equivalent to a requirement of tort causation.  *Natural Res. Def. Council, Inc. v. Watkins*, 954 F.2d 974, 980 n.7 (4th Cir. 1992).  The "fairly traceable" requirement "is in large part designed to ensure that the injury complained of is 'not the result of the independent action of some third party not before the court.'"  *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000) (quoting *Defenders of Wildlife*, 504 U.S. at 560).  The plaintiffs' allegation that the defendants' nationwide onslaught of litigation distracted the campaign and compelled Nader to loan his campaign $100,000 is sufficient to establish Article III standing because it traces an injury to the defendant's conduct – even if the proximate cause of that injury may lie elsewhere. *See Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 n.7 (9th Cir. 2008) (holding that county met Article III causation threshold by alleging that defendants' hiring of undocumented immigrants within county caused additional strain on county-provided health and public safety services); *Barbour v. Haley*, 471 F.3d 1222, 1226 (11th Cir. 2006) (explaining that "for purposes of satisfying Article III's causation requirement, we are concerned with something less than the

---

[7]    This line of argument strikes the court as strained: it is perfectly plausible that the Nader-Camejo 2004 Campaign and the defendants might be jointly and severally liable for the loan default. Two defendants may be found jointly liable if each is a proximate cause of the injury.  *Westfarm Assocs. Ltd. Partnership v. Wash. Suburban Sanitary*, 66 F.3d 669, 687 (4th Cir. 1995).  Because the possibility that the campaign might default on the loan was a foreseeable event, the default does not necessarily act as a supervening cause vitiating the contributory impact of the defendants' alleged tortious conduct.  *Id.*  Thus, while the defendants may be correct that the court has no authority to order the Nader-Camejo 2004 Campaign to repay the loan, DNC's Mot. to Dismiss at 20, that presents a question distinguishable from whether the defendants may be held liable for Nader's loss by the campaign's default.

concept of proximate cause") (citation and internal quotation marks omitted); *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 122 n.8 (2d Cir. 2003) (holding that plaintiffs failed to meet RICO proximate causation requirements but satisfied "the lesser burden for constitutional standing" by alleging that they would have ceased investing in attorney's fraudulent investment scheme had defendants met reporting requirements that would have resulted in attorney being promptly disbarred). The defendants (rather than the Nader-Camejo 2004 Campaign) are allegedly responsible for Nader's campaign loan, because Nader clearly alleges that but for the defendants' tortious activity he would not have been compelled to make the loan. Am. Compl. ¶ 228. This traces the injury back to the defendant; the fact that a more recent causal act (the campaign's default on the loan) intervened might break the chain of proximate cause, but that issue will not bar the plaintiffs' claims at this procedural stage.

Whether Nader or Camejo can assert standing based on financial obligations to Reed Smith depends on whether their loss is fairly traceable to the defendants or the Pennsylvania Supreme Court. The plaintiffs argue that the Pennsylvania judgment was secured by means of Reed Smith's perpetration of a fraud on the court, namely, the "concealment of [Reed's] ties with the Pennsylvania Supreme Court Justices." *Id.* ¶¶ 198, 192, 195, 229. The defendants argue that the *Rooker-Feldman* doctrine bars the court from considering this argument, as to do so would require a federal district court to act in an appellate capacity beyond its jurisdictional capacity by reviewing a state court's judgment. DNC's Reply at 6. As explained in greater depth later, the court concludes that the *Rooker-Feldman* doctrine does not preclude the exercise of this court's jurisdiction over the plaintiffs' abuse of process claims predicated on the litigation in Pennsylvania. *See infra* III.A.6. Because attachment proceedings have commenced against

Nader in D.C., and because Camejo's settlement was predicated on an adverse judgment of costs, they both have standing to bring this suit based on their monetary losses.

### 5.  The Request for Injunctive Relief is Inappropriate

The plaintiffs request "permanent injunctive relief against all ongoing and future violations of law by Defendants and their co-conspirators." Am. Compl. at 68.  The defendants describe this request as moot, pointing out that the 2004 election is over.  DNC's Mot. to Dismiss at 13; Reed Smith's Mot. to Dismiss at 23.  To the extent the plaintiffs seek an injunction barring the defendants from challenging Nader's ballot eligibility in 2008, the defendants argue that such a request is purely speculative,[8] as no objection to Nader's eligibility in any state has yet been raised.  *Id.*  The plaintiffs protest that their request is not moot, as the defendants' wrongful conduct might recur, Pls.' Opp'n at 36, by which presumably they mean the defendants might pursue legal action challenging Nader's eligibility in the 2008 election cycle.  Additionally, the plaintiffs argue, the voter plaintiffs' claims are not moot, because they seek nominal damages not just injunctive relief.  *Id.* at 37.  The defendants reply that any prospective misconduct by the defendants could be reviewed by the courts before the election when such conduct occurs. DNC's Reply at 5.

In addition to injunctive relief, the plaintiffs request compensatory and punitive damages, attorneys' fees, and court costs.  Am. Compl. at 68.  Nader and Camejo are the principal plaintiffs potentially entitled to this form of recovery, although the voter plaintiffs are potentially eligible for nominal damages for their constitutional claims – assuming the plaintiffs move to reinstate them or attempt to consolidate this complaint with the case transferred from the Eastern

---

[8]    Nader announced his candidacy for president on February 24, 2008.  Pls.' Opp'n at 37.

District of Virginia.  *See People for Ethical Treatment of Animals, Inc. v. Gittens*, 96 F.3d 416,

421 (D.C. Cir. 2005) (recognizing that when a court finds a constitutional violation the court or

jury must at least award nominal damages, and assuming that such an award "prevents a case

from becoming moot").  Thus, on these traditional bases for recovery, the plaintiffs' claims are

not moot.

      As for the injunctive relief sought against the defendants' alleged ongoing violations of

law, the court construes that as referring to either the suits to enforce the Pennsylvania judgment

of costs against Nader or challenges to Nader's ballot eligibility in the 2008 election.  Starting

with the former, the court concludes that it cannot grant injunctive relief in this manner because,

while a decision invalidating the Pennsylvania judgment would derivatively deprive the

defendants of means to enforce and collect the Pennsylvania judgment, it would do so through

the normal operations of law, not by means of equitable or injunctive relief.  *See* FED. R. CIV. P.

60 (listing circumstances in which court may grant relief from judgment or order).  Thus, even

assuming the court could review and set aside the judgment of costs, it is hardly obvious that

such a decision could (1) constitute injunctive relief or (2) prohibit the defendants from

perpetuating the alleged unlawful conspiracy by, for example, seeking appellate review.

      To the extent that the plaintiffs ask this court to enjoin the defendants from engaging in

"future violations of law" in respect to challenges to Nader's ballot eligibility in 2008, they seek

relief that is simply inappropriate.  The capable-of-repetition exception to the mootness doctrine

applies only in exceptional situations, where: (1) the challenged action is in its duration too short

to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that

the same complaining party will be subject to the same action again.  *Spencer v. Kemna*,

523 U.S. 1, 18 (1998).  Neither of these circumstances exists here.  The plaintiffs have ample

opportunity to oppose any future challenges to Nader's ballot eligibility as they arise.  And there

is no reasonable expectation that the plaintiffs will again be subjected to the same conspiracy

involving the same parties and the same disputed issues from the 2004 election.  The plaintiffs

worry that a new wave of litigation will inundate them in the 2008 election cycle, but because the

plaintiffs' complaint is based on alleged violations (abuse of process and malicious prosecution)

that can only be discerned to exist and remedied retrospectively[9], they cannot provide a basis for

enjoining hypothetical future violations of the law.  *See L.A. v. Lyons*, 461 U.S. 95, 109 (1983)

(explaining that injunction to "follow the law" in the absence of some allegedly imminent

violation of the law is inappropriate); *Princeton Univ. v. Schmid*, 455 U.S. 100, 102 (1982)

(holding that the courts do not "decide hypothetical issues or [] give advisory opinions about

issues as to which there are not adverse parties").  Indeed, because the common-law claims

concern discrete, fact-particular acts now in the past, the proper question is not whether the

claims concerning alleged violations committed in 2004 are moot, but whether hypothetical

claims concerning prospective future violations in 2008 are ripe.  *Warth v. Seldin*, 422 U.S. 490,

499 n.10 (1975) (distinguishing ripeness, "whether the harm asserted has matured sufficiently to

---

[9]     To state a claim for abuse of process, a plaintiff must allege that a defendant perverted the judicial process to achieve a purpose not contemplated in the regular prosecution of the charge and that the defendant had an ulterior motive.  *Hall v. Hollywood Credit Clothing Co.*, 147 A.2d 866, 868 (D.C. 1959).  To state a claim for malicious prosecution, a plaintiff must allege (1) that the underlying suit terminated in the plaintiff's favor; (2) malice; (3) lack of probable cause; and (4) special injury.  *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C. 1980).  The plaintiffs have not explained how the court could interpret *a priori* any future federal election law filings against Nader by the defendants as exemplars of these causes of action.  The court cannot, therefore, prospectively enjoin the defendants from engaging in any political petitioning, especially as such activity implicates a fundament First Amendment freedom.  *See L.A. v. Lyons*, 461 U.S. 95 (1983) (explaining that injunction to "follow the law" in the absence of some allegedly imminent violation of the law is inappropriate because moot).

warrant judicial intervention," from mootness, "whether the occasion for judicial intervention

persists"). As the courts do not issue entirely prospective decrees enjoining parties from

engaging in "unlawful conduct" *ex ante* without enunciating the actions contemplated or

undertaken, the court denies the request for injunctive relief as inappropriate.

### 6. The Court Lacks Jurisdiction over Malicious Prosecution Claims Attacking State Court Ballot-Eligibility Cases the Plaintiffs Previously Lost

The defendants argue that the *Rooker-Feldman* doctrine deprives this court of jurisdiction

to review the state court judgments entered against Nader and Camejo. Reed Smith's Reply at

12. The plaintiffs insist that they "do not seek review by this Court of the eighteen state court

proceedings in which Defendants and their co-conspirators challenged Nader-Camejo nomination

papers in the 2004 general election, nor do Plaintiffs seek rejection of those state court

judgments." Pls.' Opp'n at 33. Whether the defendants conspired and committed the torts of

malicious prosecution and abuse of process against the plaintiffs is not, the plaintiffs argue, an

issue that any state court decided, nor is it "inextricably intertwined with the questions ruled

upon by a state court." *Id.* at 33-34 (quoting *Dist. of Columbia Court of Appeals v. Feldman*, 460

U.S. 462, 483 (1983)). The defendants maintain that the thrust of the complaint is a specific

challenge to the state court and in particular the Pennsylvania court's judgments. Ballot Project's

Reply at 6.

The *Rooker-Feldman* doctrine holds that the U.S. Supreme Court's appellate jurisdiction

precludes federal district courts from exercising subject-matter jurisdiction to review state-court

judgments in an appellate capacity. The Supreme Court has made clear that the doctrine "is

confined to cases . . . brought by state-court losers complaining of injuries caused by state-court

judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Assuredly, it "does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions." *Id.*

As an initial matter, one should recognize that the *Rooker-Feldman* doctrine does not cover every case in which a "party attempts to litigate in federal court a matter previously litigated in state court." *Exxon Mobil Corp.*, 544 U.S. at 293. If a plaintiff presents an independent claim, "albeit one that denied a legal conclusion that a state court has reached in a case to which [the plaintiff] was a party," then the doctrine does not apply. *Id.* The district court has jurisdiction, and state law determines whether principles of issue preclusion bar further litigation. *Exxon Mobil Corp.*, 544 U.S. at 293. The doctrine merely prohibits lower federal courts from hearing cases "inextricably intertwined with the questions ruled upon by a state court"; in other words, cases functionally equivalent to an appeal from a state court. *Gray v. Poole*, 275 F.3d 1113, 1119 (D.C. Cir. 2002).

The plaintiffs' abuse of process claims do not require this court to revisit a matter previously decided in state court. A claim for abuse of process need only allege that a defendant perverted the judicial process, achieved a purpose not contemplated in the regular prosecution of the charge and harbored an ulterior motive. *Hall v. Hollywood Credit Clothing Co.*, 147 A.2d 866, 868 (D.C. 1959).[10] The plaintiffs allege a perversion of judicial process (the prosecution of

---

[10]    Abuse of process "is conceptually different from, but overlaps with, malicious prosecution, the latter of which occurs only when a legal action is brought without probable cause" and terminates in the malicious-prosecution plaintiff's favor. *Whelan*, 953 F.2d at 670.

a nation-wide barrage of litigation to overwhelm Nader's finances and attention) and the accomplishment of an improper result (compelling Nader to loan his campaign money and divert attention from campaigning to secure votes) and an ulterior motive (preventing Nader from competing for votes).[11]  Am. Compl. ¶¶ 228-32.  The elements of this claim do not require this court to inspect any of the eighteen state court judgements regarding Nader's ballot eligibility, because none of those judgments concerned the legality of the defendants' actions in initially bringing the claims.  *See Gray*, 275 F.3d at 1119 (holding that *Rooker-Feldman* did not apply because the subject of the federal action – the legality of the defendants' actions – was not at issue in the prior state action); *Brokaw v. Weaver*, 305 F.3d 660, 665 (7th Cir. 2002) (refusing to apply *Rooker-Feldman* because plaintiff was "not merely claiming that the decision of the state court was incorrect . . . [but] alleging that the people involved in the decision . . . violated her constitutional rights, independently of the state court decision").  Thus, the state court judgments did not "cause" the plaintiffs' injury.  *See GASH Assocs. v. Vill. of Rosemont, Ill.*, 995 F.2d 726, 729 (7th Cir. 1993) (explaining that *Rooker-Feldman* applied because the plaintiff "did not suffer an injury out of court and then fail to get relief from state court; its injury came from the judgment").  The court, therefore, possesses jurisdiction to hear all of the abuse-of-process claims.

The plaintiffs' malicious prosecution claims, however, are another matter.  To state a claim for malicious prosecution, a plaintiff must allege that the defendant, without probable cause and with malicious intent, initiated or procured the filing of an action that terminated in the

---

[11]    This recitation of the plaintiffs' allegations supporting their abuse-of-process claim should not be construed to encompass the conclusion that the plaintiffs have successfully stated an abuse-of-process claim.  For as the court explains later, they have not.  *See infra* III.B.2.

plaintiff's favor. *Moore v. United States*, 213 F.3d 705, 710 (D.C. Cir. 2000). D.C. courts also require the plaintiff to establish that he incurred a "special injury." *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C. 1980). The plaintiffs allege that the defendants caused 24 complaints to be filed in 18 states. Am. Compl. ¶ 3. The plaintiffs admit that they lost the suits in Ohio, Oregon, Illinois, and Pennsylvania. *Id.* ¶ 71. The plaintiffs allege that they withdraw their petition to place Nader on the ballot in Arizona because opposing the defendants' challenge to the petition was prohibitively costly. *Id.* This case, too, however, did not terminate successfully, because the Arizona court enjoined the Secretary of State from including Nader on the ballot after Nader admitted that he failed to collect a sufficient number of valid signatures. *Nader v. Brewer*, 2006 WL 1663032, at *1 (D. Ariz. Jun. 8, 2006). In order to prevail on their malicious prosecution claims predicated on filings in Ohio, Oregon, Illinois, Pennsylvania, and Arizona, then, the plaintiffs must confront the respective state court judgments.

Nevertheless, for the purposes of applying *Rooker-Feldman*, there is a difference between attacking a judgment and attempting to relitigate a claim or bypass a judgment. *See A.D. Brokaw v. Weaver*, 305 F.3d 660, 664 (7th Cir. 2002) and *Tremel v. Bierman & Geesing, L.L.C.*, 251 F. Supp. 2d 40, 44 (D.D.C. 2003) (recognizing distinction between attacking judgment directly and bypassing it through relitigation, and noting that attempts to bypass previous adjudications are more properly disposed of under the doctrine of *res judicata*). To the extent that the plaintiffs argue that the prior judgments should be vacated or set aside because of procedural deficiencies not brought to the state court's attention, they are merely seeking to bypass the judgment. *See Nesses v. Shepard*, 68 F.3d 1003, 1004 (7th Cir. 1995) (holding that plaintiff alleging procedural irregularities and conspiracies in prior state court suits deprived him of his constitutional rights

18

was blocked from bringing federal court claim not by *Rooker-Feldman* but by *res judicata*).  This

would not pose a *Rooker-Feldman* problem.  *Id.*  Alternatively, to the extent that their claim can

succeed only by arguing that the state court "wrongly decided the issues before it," the plaintiffs

are seeking to attack the judgment.  *See Charchenko v. City of Stillwater*, 47 F.3d 981, 983 (8th

Cir. 1995) (holding that a claim is "inextricably intertwined" under *Rooker-Feldman* when the

claim "succeeds only to the extent that the state court wrongly decided the issues before it [or] if

the relief requested . . . would effectively reverse the state court decision or void its ruling").

This would pose a *Rooker-Feldman* problem.  *Id.*

As for the malicious prosecution claims based on cases that did not terminate in Nader-

Camejo's favor, those claims are barred because the plaintiffs must attack the prior judgments to

establish the element of their malicious prosecution claims providing that a prior case must

terminate in the plaintiff's favor.[12]  Favorable termination does not require a final disposition on

the merits; rather, any termination that "reflects on the innocence of the defendant in the

underlying suit" may suffice.  *Brown v. Carr*, 503 A.2d 1241, 1245 (D.C. 1986) (citing *Minasian

v. Sapse*, 80 Cal. App. 3d 823, 827 (1978)).  By this definition, then, the actions in Ohio, Oregon,

---

[12]    The court notes that the question of whether the plaintiffs' Federal Rule of Civil Procedure 60(b) motion for relief from judgment in the D.C. Superior court implicates *Rooker-Feldman* is analytically distinct from whether the plaintiffs' claims for malicious prosecution implicate *Rooker-Feldman*.  The former raises issues not presented before the Pennsylvania Supreme Court.  Specifically, the motion for relief cites newly discovered evidence of alleged connections between Reed Smith and the Pennsylvania Supreme Court justices, which, the plaintiffs argue, should have resulted in the justices' recusals.  Pls.' Opp'n, Ex. 1 ("Pls.' Mot. for Relief from Foreign Judgment") at 16.  This, then, would appear to touch upon questions of *res judicata* or issue preclusion but not *Rooker-Feldman* concerns.  *Nesses*, 68 F.3d at 1004.  To be clear, this court predicates its holding that some of the plaintiffs' malicious prosecution claims do confront *Rooker-Feldman* not on the plaintiffs' motion for relief from judgment but on their amended complaint filed in this court.

Illinois, Arizona, and Pennsylvania did not terminate in the plaintiffs' favor.[13]  For the court to conclude otherwise would be to sit as in appeal over those judgments, not just to contemplate whether preclusion principles barred the claims.  *See, e.g.*, *Calvert v. Safranek*, 209 Fed. Appx. 816, 819 (10th Cir. 2006) (holding that *Rooker-Feldman* applied because court could not recognize plaintiff's malicious prosecution claim without directly or indirectly overturning state court judgments he protested); *Ewing v. O'Brien*, 115 Fed. Appx. 780, 782 (6th Cir. 2004) (holding that *Rooker-Feldman* applied because plaintiff's claims for abuse of process and malicious prosecution could succeed only to the extent that prior state court decisions were wrong).  The malicious prosecutions claims based on litigation conducted in these states must, therefore, be dismissed.

## B.  Abuse of Process and Malicious Prosecution Claims

### 1.  Legal Standard for Rule 12(b)(6) Motion to Dismiss

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  The complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests.  *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (citing FED. R. CIV. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pre-trial procedures established by the Rules to disclose more precisely the basis of both claim and defense to define more narrowly the disputed facts and issues."  *Conley*, 355 U.S. at 47-48 (internal quotation marks omitted).  It is not necessary for the plaintiff to plead all elements of his

---

[13]    The defendants do not dispute that the other cases terminated in the plaintiffs' favor.

prima facie case in the complaint, *Swierkiewicz v. Sonoma N.A.*, 534 U.S. 506, 511-14 (2002), or

"plead law or match facts to every element of a legal theory," *Krieger v. Fadely*, 211 F.3d 134,

136 (D.C. Cir. 2000) (internal quotation marks and citation omitted).  That said, it is possible,

however, "for a plaintiff to plead too much: that is, to plead himself out of court by alleging facts

that render success on the merits impossible." *Sparrow v. United Airlines, Inc.*, 216 F.3d 1111,

1116 (D.C. Cir. 2000).

Yet, the plaintiff must allege "any set of facts consistent with the allegations." *Bell Atl.

Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007) (abrogating the oft-quoted language from

*Conley*, 355 U.S. at 45-56, instructing courts not to dismiss for failure to state a claim unless it

appears beyond doubt that "no set of facts in support of his claim [] would entitle him to relief");

*Aktieselskabet AF 21. November 2001 v. Fame Jeans, Inc.*, 2008 WL ****, at ** n.4 (D.C. Cir.

Apr. 29, 2008) (affirming that "a complaint needs *some* information about the circumstances

giving rise to the claims").  While these facts must "possess enough heft to 'sho[w] that the

pleader is entitled to relief,'" a complaint "does not need detailed factual allegations." *Id.* at

1964, 1966.  In resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual

allegations – including mixed questions of law and fact – as true and draw all reasonable

inferences therefrom in the plaintiff's favor. *Macharia v. United States*, 334 F.3d 61, 64, 67

(D.C. Cir. 2003); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir.

2003); *Browning*, 292 F.3d at 242.  While many well-pleaded complaints are conclusory, the

court need not accept as true inferences unsupported by facts set out in the complaint or legal

conclusions cast as factual allegations. *Warren v. District of Columbia*, 353 F.3d 36, 40 (D.C.

Cir. 2004); *Browning*, 292 F.3d at 242.

21

A defendant may raise the affirmative defense of statute of limitations via a Rule 12(b)(6) motion when the facts that give rise to the defense are clear from the face of the complaint. *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998).  Because statute of limitations issues often depend on contested questions of fact, however, the court should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint. *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996).  Rather, the court should grant a motion to dismiss only if the complaint on its face is conclusively time-barred.  *Id.*; *Doe v. Dep't of Justice*, 753 F.2d 1092, 1115 (D.C. Cir. 1985).  If "no reasonable person could disagree on the date" on which the cause of action accrued, the court may dismiss a claim on statute of limitations grounds.  *Smith v. Brown & Williamson Tobacco Corp.*, 3 F. Supp. 2d 1473, 1475 (D.D.C. 1998) (citing *Kuwait Airways Corp. v. Am. Sec. Bank, N.A.*, 890 F.2d 456, 463 n.11 (D.C. Cir. 1989)).

## 2.  The *Noerr-Pennington* Doctrine Bars the Plaintiffs' Claims

The *Noerr-Pennington* doctrine holds that defendants who petition the government for redress of grievances, "whether by efforts to influence legislative or executive action or by seeking redress in court," are immune from liability for such activity under the First Amendment. *Covad Comm'cns Co. v. Bell Atlantic Corp.*, 398 F.3d 666, 677 (D.C. Cir. 2005); *see E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).  The doctrine's provenance lies in the field of antitrust law, but its reach has since then been extended to include common-law torts such as malicious prosecution and abuse of process.  *Whelan v. Abell*, 48 F.3d 1247, 1254 (D.C. Cir. 1995).  "Sham" litigation, however, receives no protection, and the presumption of

immunity is dispelled when a lawsuit (1) is objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits and (2) is brought with the specific intent to further wrongful conduct "through the use [of] the governmental process – as opposed to the outcome of that process." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60-61 (1993). The sham exception does not extend to genuine attempts to secure governmental action even though the defendant harbors a wrongful motive. *Neumann v. Reinforced Earth Co.*, 594 F. Supp. 139, 142 (D.D.C. 1984). The court proceeds to the second prong of the test only if the challenged litigation is found to be objectively meritless under the first prong. *Prof'l Real Estate Investors, Inc.*, 508 U.S. at 60. The plaintiff bears the burden to demonstrate that the sham exception applies. *Federal Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 262-63 (D.C. Cir. 1981).

The defendants argue that the plaintiffs have not demonstrated that the sham exception to the *Noerr-Pennington* doctrine deprives them of immunity for their filing of suits to challenge Nader's ballot eligibility in various states. Reed Smith's Mot. to Dismiss at 11; Kerry's Mot. to Dismiss at 15; Ballot Project's Mot. to Dismiss at 17. The defendants remind the court that the states have "the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates." Reed Smith's Mot. to Dismiss at 13 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). They argue that the plaintiffs cannot plausibly maintain that the suits in the five states in which the defendants prevailed were baseless. Reed Smith's Mot. to Dismiss at 15. Moreover, they deny that the plaintiffs have proffered any evidence suggesting that the defendants harbored an improper

motive for their suits.  *Id.*  The plaintiffs respond that in bringing allegations of abuse of process and malicious prosecution they have sufficiently alleged, for the purpose of a motion to dismiss, that the sham exception applies.  Pls.' Opp'n at 30-31.

Here, again, the plaintiffs' claims stumble over the impediment of prior adverse judgments.  They cannot bring claims predicated on the challenges brought in the five states where the plaintiffs lost, because they could not plausibly establish the first prong of the sham exception.  One cannot come before a court and argue that litigation that terminated in one's opponent's favor is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."  *See Prof'l Real Estate Investors*, 508 U.S. at 61 (holding that "[a] winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham").  This alone bars the plaintiffs' abuse-of-process claims based on the suits in Arizona, Ohio, Illinois, Oregon, and Pennsylvania.

The abuse-of-process and malicious prosecution claims based on the actions in which the plaintiffs prevailed (in other words, in the remainder of the states in which litigation was brought) are also barred, but for a different reason.  Assuming that the plaintiffs' allegation that the defendants' challenges in the other states were objectively baseless is true[14], *see Cal. Motor Transp.*, 504 U.S. at 510 (suggesting that "a pattern of baseless, repetitive claims may emerge

---

[14]   This is a significant assumption.  An unsuccessful lawsuit is not presumed unreasonable or without foundation until a court has determined whether the state of the law at the time of the suit was uncertain or not.  *Prof'l Real Estate Investors*, 508 U.S. at 61; *Organon Inc. v. Mylan Pharms., Inc.*, 293 F. Supp. 2d 453, 462 (D.N.J. 2003).  The plaintiffs do not brief this question, but because this case is before the court on a motion to dismiss and alternative grounds for dismissal exist, the court will (preliminarily) assume the plaintiffs could establish this question in their favor.

which leads the factfinder to conclude that the administrative and judicial processes have been abused"), the plaintiffs fail to submit a motive sufficient to satisfy the second prong of the sham exception: that the defendant harbored a motive to subvert the legal process for wrongful ends. The plaintiffs vigorously proclaim that the defendants brought the various challenges with the self-serving intent to prevent Nader from competing with Kerry in the 2004 election. Am. Compl. ¶ 1. But the First Amendment cannot be abrogated simply by alleging that one's political opponent turned to the judicial process for partisan motives. *See U.S. v. Am. Tel. and Tel. Co.*, 524 F. Supp. 1336, 1364 (D.D.C. 1981) (explaining that "[t]o be a sham, the representation must go beyond the normal and legitimate exercises of the right to petition; it must amount to a subversion of the integrity of the process . . . . [contemplating] evidence of a series of misleading statements, of representations having the effect of actually barring access to an official body, or of an intent to mislead the body concerning central facts"); *Westmac, Inc. v. Smith*, 797 F.2d 313, 317 (6th Cir. 1986) (holding that sham exception does not apply merely because a party files a suit with principle purpose of harming competitor).

The court rejects the argument that partisan motives alone can satisfy the sham exception – the proposition is at once both too broad and too narrow. It is too broad because every litigant has a personal stake in an action and, thus, a selfish motive of some sort; otherwise, they would lack standing. Were the court to adopt the plaintiffs' principle that any motive other than the altruistic impulse to see that the law is observed renders a litigant liable, then (1) the ability of individuals to petition the government for a redress of grievances would be endangered and (2) the election laws regulating the political process and relying on private challenges would be compromised. *See id.* (emphasizing that the sham exception should be "narrowly construed

25

so as not to chill the rights of individuals and corporations to access to courts"); *see also City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 381-82 (1991) (holding that sham exception turns on distinction between using governmental process itself to commit wrongdoing versus benefitting from outcome of governmental process).

The principle is too narrow because it ignores the nexus linking the two prongs of the test. The first prong (that a claim be objectively baseless) must be satisfied because it is a necessary precondition of the second (that the litigation is an attempt to pervert the judicial process). *See Prof'l Real Estate Investors*, 508 U.S. at 61 (holding that the "two-tiered process requires the plaintiff to disprove the challenged lawsuit's legal viability" first). From the proposition "Plaintiff A has brought an objectively baseless claim," the court follows the path of reason down to the descending conclusions that (1) it is very likely that the plaintiff knows his claim is objectively baseless, (2) the plaintiff anticipates he will not win on the merits, and (3) the plaintiff is, therefore, bringing a claim for purposes other than seeing that ends of the justice are vindicated. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 n.4, 508 n.10 (1988) (holding that a sham situation involves a defendant whose activities are "not genuinely aimed at procuring favorable government action" at all, not one "who genuinely seeks to achieve his governmental result, but does so through improper means") (internal quotations omitted); *see also* FED. R. CIV. P. 11(b) (defining a plausible claim as one "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law"). If one adopts the plaintiffs' preferred starting point, however, one will not arrive so inevitably and smoothly at the third conclusion, a critical destination for

establishing the claim that the defendant has perverted or abused judicial process.[15]

The plaintiffs do aver that the defendants rushed to judgment by declaring, before Nader announced his candidacy, that they would challenge his ballot eligibility – arguing that this demonstrates that the challenges were baseless and solely intended to harass him.  Am. Compl. ¶ 2.  But, anticipating a legal campaign in the contingency of a political opponent's entry into a race is different from knowingly filing challenges that one knows *at the time of filing* to be false or baseless.  *See Am. Tel. & Tel. Co.*, 524 F. Supp. at 1364 (concluding that government properly invoked sham exception when it submitted evidence that defendant opposed an FCC application by a competitor on grounds that it knew "at that very time" to be untrue).  The plaintiffs have proffered no evidence nor raised any allegations that the defendants presented claims that they knew to be false or baseless.[16]  *Cf. Cal. Motor Transp.*, 404 U.S. at 508 (applying sham exception

---

[15]    The inverse is true too; that is to say, one might have an improper purpose in bringing suit but still not commit an abuse of process sufficient to invoke the sham exception if one's suit is not objectively baseless.  *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 63 (1993) (explaining that "[j]ust as evidence of [wrongful] intent cannot affect the objective prong of *Noerr's* sham exception, a showing of malice alone will neither entitle the wrongful civil proceedings plaintiff to prevail nor permit the factfinder to infer the absence or probable cause").  For this reason, the court does not consider statements allegedly made by the defendants evincing a potentially improper purpose pertinent to the instant question.  Am. Compl. ¶¶ 62-63.  Even assuming their veracity, they only constitute evidence of subjective state of mind, not the objective plausibility of the defendants' challenges on the merits when filed.

[16]    The plaintiffs do argue that Reed Smith perpetrated a fraud on the Pennsylvania Supreme Court by failing to disclose certain connections between its attorneys and presiding justices.  *See generally* Pls.' Mot. for Relief from Judgment.  Assuming these facts to be true, they nevertheless fail to give rise to a legal conclusion that the defendants' knowingly presented baseless claims against the plaintiffs to the court.  While the court refrains from issuing a substantive opinion on the plaintiffs' motion before the Superior Court, it notes that for the purposes of the sham exception, the claim at most suggests a technical, procedural impropriety pertinent to the judicial ethics of recusal not the merits of the case itself.  *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 508 n.10 (holding that sham exception does not cover party who genuinely seeks to achieve his governmental result, but does so through improper means).

to party who filed frivolous objections to license application of competitor with no expectation of achieving favorable judgment but rather to impose expense and delay). Nor have they alleged that the defendants had no real interest in the outcome of the litigation but merely sought to directly injure the plaintiff. *Allied Tube*, 486 U.S. at 500 n.4.

Reinforcing the court's conclusion is the fact that the second prong of the sham exception mimics the run-of-the-mine abuse-of-process claim, *e.g.*, *Fed'l Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 263 n.9 (D.C. Cir. 1981); *Westmac, Inc.*, 797 F.2d at 320 n.12 (conceding that "if plaintiff could establish that defendants' actions constitute the tort of abuse of process, in the sense that defendants' suit corrupted or improperly interferred [sic] with the judicial process, [then] the sham exception does apply"), and the plaintiffs fail to state a claim for abuse of process. Put simply, if the plaintiffs fail to state a claim for abuse of process, they also fail to satisfy the second prong of the sham exception. *Id.*

Of particular relevance here is the fact that both doctrines require the perversion of process for a collateral end. *Morowitz*, 423 A.2d at 198 (holding that the tort of abuse of process lies where the legal system "has been used to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be required to do"); *Prof'l Real Estate Investors, Inc.*, 508 U.S. at 70 (explaining that sham exception turns on whether there was "collateral harm external to the litigation or to the result reached in the litigation") (internal quotations omitted). This perversion towards a collateral end must occur after the initiation of litigation. *See Houlahan v. World Wide Ass'n of Specialty Programs and Schools*, 2006 WL 2844190, at *8 n.12 (D.D.C. Sept. 29, 2006) (holding that allegation of defendant's intent to silence criticism

28

through initiation of lawsuits was insufficient to raise abuse-of-process claim); *Nolan v. Allstate Home Equipment Co.*, 149 A.2d 426, 430 (D.C. 1959) (holding that ulterior motive of coercion does not suffice: "there was nothing more than the issuance and service of process; no attempt was made to compel appellant to do some collateral act, nor was the process used to accomplish some end beyond its regular purview"). Filing a lawsuit with the incidental motive to inflict harm on the plaintiff does not arise to abuse of process. *See, e.g.*, *Rogers v. Johnson-Norman*, 466 F. Supp. 2d 162, 175 (D.D.C. 2006) (holding that "incidental motive of spite or an ulterior purpose of benefit to the defendant" does not give rise to abuse-of-process claim); *Harrison v. Howard Univ.*, 846 F. Supp. 1, 3 (D.D.C. 1993) (dismissing abuse-of-process claim that merely alleged ulterior motive); *Morowitz*, 423 A.2d at 198-199 (holding that "[w]ithout more, appellants' proffer that appellee filed the counterclaim with the ulterior motive of coercing settlement, is deficient").[17]

The plaintiffs urge the court to adopt the expansive formulation of the abuse of process standard set forth in *Neumann v. Vidal*, 710 F.2d 856 (D.C. Cir. 1983) and *Whelan v. Abell*, 953 F.2d 663 (D.C. Cir. 1992), in support of their argument that the mere initiation of a suit and allegation of an ulterior motive could serve as the perversion of process. Pls.' Opp'n at 22. But, these cases have been superceded by more recent decisions embracing the more restrictive standard of *Bown v. Hamilton*, 601 A.2d at 1079-80, and *Morowitz*, 423 A.2d at 198-99. *See Moore v. United States*, 213 F.3d 705 (D.C. Cir. 2000); *Scott v. District of Columbia*, 101 F.3d 748 (D.C. Cir. 1996). Underlying this standard is the purpose of allowing "unfettered access to

---

[17]     In their opposition, the plaintiffs appear to recognize this, as they write that "abuse of process refers to the wrongful use of process after it has been properly issued." Pls.' Opp'n at 20 (citing 1 AM. JUR. 2D *Abuse of Process* § 3 (1994)).

the courts" and avoiding any "chilling and inhibitory effect on would-be litigants of justiciable issues." *Bown*, 601 A.2d at 1080; *Morowitz*, 423 A.2d at 197-98.

Thus, the inescapable *sine qua non* of an abuse-of-process claim and the second prong of the sham exception is that a defendant has used process to compel a party to do a collateral thing that they would not otherwise do. *Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*, 383 F. Supp. 2d 32, 46 (D.D.C. 2005). Typically, this end is an attempt at extortion in a manner collateral to the litigation. *Scott*, 101 F.3d at 756. Initiating a law suit with the ulterior motive of forcing normal litigation expenses and distractions on an opponent does not constitute the sort of collateral end that is recognized as an abuse of process.[18] *See, e.g.*, *Kalantar v. Lufthansa German Airlines*, 402 F. Supp. 2d 130, 150 (D.D.C. 2005) (holding that plaintiff who merely alleged that defendants "maliciously caused process to issue" against him did not properly allege any abuse of process); *Camm v. Kennickell*, 1990 WL 198621, at *3 (D.D.C. Nov. 20, 1990) (holding that allegation that plaintiffs filed lawsuit to coerce defendants into awarding them contracts was insufficient to state abuse-of-process claim). These are the natural consequences of a lawsuit and too generic to serve as the predicate for an abuse-of-process rather than malicious prosecution claim. *Fraternal Order of Police, D.C. Lodge 1, Inc. v. Gross*, 2005 WL 3201400, at *2 (D.D.C. Nov. 9, 2005) (holding that alleging defendant filed suit to extort concession or settlement does not state abuse-of-process claim). The court, therefore, concludes that the sham

---

[18]    The plaintiffs' argument that the litigation the defendants allegedly subjected them to was particularly onerous because it was conducted successively in multiple states is unpersuasive because the piecemeal nature of our federalist electoral process rendered that a necessity. *See Tri-State Hosp. Supply Corp. v. United States*, 2007 WL 2007587, at *7-8 (D.D.C. July 6, 2007) (holding that lack of "unusual or exceptional procedures" and evidence "to suggest that the proceedings were longer or more onerous than otherwise would have been necessary" precluded abuse-of-process claim).

exception bars the plaintiff's remaining abuse-of-process and malicious prosecution claims.

With the last of the common-law claims dismissed, the plaintiffs' conspiracy claim has no predicate; therefore, the court must dismiss it as well.  *See Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000) (holding that "there is no recognized independent tort action for civil conspiracy" in D.C.) (citing *Waldon v. Covington*, 415 A.2d 1070, 1074 n.14 (D.C. 1980)).  Because none of the plaintiffs' claims survive the motion to dismiss, the court dismisses the plaintiffs' amended complaint.[19]

## IV.  CONCLUSION

For the foregoing reasons, the court grants the defendants' motions to dismiss.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 27th day of May, 2008.

RICARDO M. URBINA
United States District Judge

---

[19]    In addition to abusive litigation, the plaintiffs allege that the defendants orchestrated campaigns of "harassment, intimidation and sabotage," with the specific intention of preventing Nader-Camejo from complying with state election laws.  Am. Compl. ¶¶ 67-71, 236.  They do not, however, raise these allegations in the context of any specific underlying tort other than conspiracy, which is itself merely a form of establishing the liability of multiple defendants for a predicate tort.  *Hill v. Medlantic Health Care Group*, 933 A.2d 314, 334 (D.C. 2007).